

FILED

Jan 25 2017, 12:37 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 20S00-1601-LW-00061

MICHAEL T. SHOUN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Elkhart Superior Court, No. 20C01-1311-MR-000007
The Honorable Terry C. Shewmaker, Judge

On Direct Appeal from a Sentence of Life Imprisonment Without Parole

**January 25, 2017**

**David, Justice.**

A jury found defendant guilty of murdering his 17-year-old girlfriend and recommended a sentence of life without parole. The trial court entered judgment accordingly. In a direct appeal, defendant now challenges his sentence arguing that: 1) the trial court committed fundamental error because it should have *sua sponte* determined that he had an intellectual disability, precluding a life without parole sentence, even though his trial counsel withdrew the petition to determine

whether he had said disability; 2) his sentence is unconstitutionally disproportionate pursuant to Article 1, Section 16 of the Indiana Constitution; and 3) his sentence is inappropriate pursuant to Indiana Appellate Rule 7(B). In light of the facts and circumstances of this case, we hold that the trial court did not commit fundamental error, that defendant's sentence is proportional considering the severe nature of the crime and that defendant's sentence is not inappropriate in light of the nature of the crime and his character. Accordingly, we affirm the trial court.

**Facts and Procedural History**

In November 2013, Michael Shoun was dating Tiana Alter, who was 17 years old at that time. Shoun was approximately 8-9 years older than Alter and had been dating her since she was 13. Alter lived with Shoun's sister, Aeirel. Shoun was supposed to be residing in a work release facility as part of his sentence for a class C felony being a habitual traffic offender conviction; however, Shoun was a fugitive from the facility and was staying in Alter's room at his sister's home.

Both Alter and Shoun used synthetic drugs. Alter would fall into a deep sleep as a result of her drug use, while Shoun would become paranoid as a result.

On November 2, 2013, several members of Shoun's family gathered at Aeirel's home for a small party, including Shoun's cousin, Michael Lewis. Aeirel was not home, and while Shoun and Alter were there, they spent most of the time in Alter's room with the door shut, apparently smoking synthetic marijuana.

When Shoun came out of the bedroom, Lewis noticed blood on him. Lewis asked Shoun why he was bleeding and Shoun indicated that it was not his blood. Fearing something bad had happened, Lewis then asked to be let into the room. At about the same time, Aeirel returned home and heard a loud noise, like someone being thrown into the wall. She came out to the hallway to find Lewis asking Shoun to be let into the room.

2

Once let into the room, Shoun saw Alter rolled up inside carpet that had been pulled up from the floor. He saw and smelled a large amount of blood. He shook Alter's shoulder and called out her name, but she did not respond; she was cold to the touch.

Shoun told Lewis he needed help to get rid of the body and then started talking about satellites, the devil and empires. Lewis told the others that Alter was dead and he and Aeirel decided to leave the home. Aerial called 911 and reported that she believed her brother killed his girlfriend.

When police arrived at the home, they found Shoun in the basement throwing and breaking things. Shoun told police not to come downstairs, but when they did, they found him sitting against the wall with a shirt covering his hands. Shoun told police to leave or else "it's going to blow up." (Tr. 372.) After multiple officers arrived and drew their weapons, Shoun eventually complied and allowed himself to be handcuffed. He told one of the officers "she's dead." (Tr. 413.)

Officers brought Shoun upstairs to the living room and they checked the rest of the home. They located Alter's body in her bedroom. Police arrested Shoun and placed him in a patrol car, where he was belligerent and argumentative. During a pat-down search, police recovered Alter's identification and a hand-rolled cigarette that Shoun said contained K2 (a synthetic marijuana) from Shoun's person. On the way to the station, Shoun sometimes made nonsensical statements such as quoting nursery rhymes, discussing Martin Luther King and commenting on the fact that the sheriff's department was conveniently located near the landfill because there were a lot of bodies in the landfill. While at the police station, Shoun's behavior was sometimes lucid and cooperative and at other times argumentative and aggressive. He continued to make nonsensical statements.

Meanwhile, a crime scene investigator arrived at the scene. He entered Alter's room, unrolled the carpet, noticed a large area of blood staining on the carpet and the floor and found Alter's body to have a large abdominal injury with her entrails showing. He found a knife blade under Alter's left arm, a knife handle and another knife nearby. Testing revealed Alter's DNA on both knives. The investigator also found three synthetic drug packages in the room, two of which were empty.

3

An autopsy revealed that parts of Alter's internal organs had been separated from their normal positions and entangled with her intestines. Her body had a large gaping wound over nine inches in length from the lower chest area to below the navel and multiple sharp force injuries to internal organs. Shoun inflicted so many cut and stab wounds to Alter's body that the forensic pathologist who completed her autopsy was unable to accurately count them. Shoun inflicted stab wounds to her stomach, rib cage, liver, diaphragm, kidneys, small and large intestines, pancreas, vena cava (the vein carrying blood from the lower body to the heart), her aorta (the main artery carrying blood from the heart to the body), and the membrane between her bladder and uterus. He completely severed a portion of her small intestine and completely cut out her spleen and right kidney. He repeatedly stabbed the pericardial sac surrounding her heart in a manner that could only be accomplished by stabbing up from below through her diaphragm. Other injuries indicated that Shoun may also have strangled Alter. Nearly all of Alter's wounds displayed bleeding that indicated the heart was beating when the wounds were inflicted, and thus, a vast majority of Alter's wounds were inflicted while she was still alive. Alter had alcohol and synthetic marijuana in her system.

The State charged Shoun with Alter's murder. Shortly after being appointed, Shoun's counsel requested a competency evaluation. Because the first two competency evaluations were in conflict about whether Shoun was competent, a third evaluation was ordered. It revealed that Shoun was competent. The State amended its charging information to request a sentence of life without parole (LWOP). It alleged two aggravating circumstances in support of LWOP: 1) that Shoun was in the custody of the Department of Correction at the time of the murder; and 2) that Shoun mutilated Alter while she was alive.

Shoun filed a petition alleging that he suffers from an intellectual disability that makes him ineligible for a LWOP sentence. However, Shoun ultimately withdrew this petition, as Shoun's trial counsel believed this petition would not be successful. At a hearing, defense counsel explained that he wanted to "make a record as to what we've done so that people know that there was really no chance of us succeeding on that petition." (Tr. 87.) Counsel then detailed the efforts undertaken, explaining that in addition to obtaining the court ordered evaluations and the earlier psychological evaluation that had been performed for use as mitigation evidence, counsel had

spoken to Shoun's family members, obtained medical and school records, reviewed records from juvenile probation and the Bashor Home (where Shoun was placed for a time as a child) and spoken with Shoun's juvenile probation officer. After a review of all this evidence, defense counsel concluded that they could not meet their burden to prove Shoun suffered from an intellectual disability that manifested itself prior to the age of 22 and asked to withdraw the petition. The prosecutor stated that she had also gathered information and conferred with defense counsel and agreed that the defense could not prove the claim. Because Shoun withdrew his petition, the trial court cancelled the hearing on his petition and made no findings regarding the existence of an intellectual disability under the statute.

The case proceeded to a bifurcated jury trial. During the first phase, the jury found Shoun guilty of murder, a felony. Following the penalty phase, the jury found that the State proved beyond a reasonable doubt at least one of the statutory aggravating circumstances. The jury also found that the statutory aggravating circumstances outweighed the mitigating circumstances. The jury recommended a sentence of LWOP be imposed. Thereafter, the trial court sentenced Shoun to LWOP. Shoun appeals only his LWOP sentence.

**Discussion and Decision**

Shoun challenges his LWOP sentence in three ways. First, he argues that while his trial counsel withdrew his petition alleging that he is an individual with an intellectual disability (and thus, cannot be sentenced to LWOP), the trial court should have nevertheless found that Shoun did indeed suffer from an intellectual disability *sua sponte*, as there is ample evidence in the record that this is the case. Shoun claims that by failing to do so, the trial court committed fundamental error. Second, he argues that his sentence is unconstitutional under Article 1, Section 16 of the Indiana Constitution as it is disproportionate in light of his intellectual disability. Finally, he argues that his sentence is inappropriate pursuant to Indiana Appellate Rule 7(B), despite the horrific nature of the offense, again citing his intellectual disability. We will discuss each of these arguments in turn.

5

### 1. Intellectual Disability

The State may not seek the death penalty or life without parole pursuant to Ind. Code section 35-50-2-9 if the trial court "determines at a pretrial hearing under IC 35-36-9 [(Disability Chapter)] that the defendant is an individual with an intellectual disability."[1] Ind. Code § 35-50-2-9(a). Pursuant to Ind. Code section 35-36-9-2 "individual with an intellectual disability" means an individual "who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior; that is documented in a court ordered evaluative report."

Here, Shoun acknowledges that his trial counsel filed a motion for a hearing under the Disability Chapter, but that counsel ultimately withdrew that motion prior to hearing. He further acknowledges that the issue is, therefore, waived for appellate review, but nevertheless, requests that this Court apply the fundamental error exception to find that the trial court should have *sua sponte* determined that he is an individual with an intellectual disability and thus, ineligible for LWOP.

Appellate courts may, on rare occasions, resort to the fundamental error exception to address on direct appeal an otherwise procedurally defaulted claim. Jewell v. State, 887 N.E.2d 939, 942 (Ind. 2008). However, fundamental error is extremely narrow and available only when the record reveals a clearly blatant violation of basic and elementary principles, when the harm or potential for harm cannot be denied, and when the violation is so prejudicial to the rights of the defendant as to make a fair trial impossible. Id. (citations omitted).

Shoun argues that while a hearing was not held on his request for the court to determine he has an intellectual disability, there was enough evidence in the record for the court to determine by clear and convincing evidence that he has an intellectual disability. He notes that two court-

---

[1] Read in isolation, some parts of the Disability Chapter suggest that it applies *only* when the State seeks the death penalty, but this Court has taken a broader view of the relevant cross-referencing statutes and held that dismissal of a request for the death penalty *or for LWOP* is required upon a determination that the defendant has a disability. See Smallwood v. State, 773 N.E.2d 259, 261-62 & n.2 (Ind. 2002) (finding Disability Chapter procedures applicable where LWOP is sought).

ordered psychological evaluations were conducted and these tests revealed his low IQ and adaptive functioning scores. He further notes that each doctor's diagnosis was that he suffered from a "mild intellectual disability." (App. 17-18, 240-45.) He argues this record demonstrates his intellectual disability.

However, in addition to reviewing court-ordered evaluations, Shoun's trial counsel also investigated this matter and, when withdrawing the motion for a hearing on his petition alleging Shoun had an intellectual disability, counsel stated:

> We've done some examination of the evidence and feel that that is not going to be something that we could be successful in. I'd like to make a record as to what we've done so that people know that there is really no chance of us succeeding on that petition, and then we'd be moving the Court to withdraw that petition.

(Tr. 87.) Counsel explained that Shoun's petition was not supported by counsel's investigation, which included communication with both Shoun's mother and his juvenile probation officer and review of his school records, juvenile probation records, records from a juvenile placement, and medical records. Specifically, counsel expressed his doubt that they could prove that Shoun's condition manifested itself prior to Shoun reaching age 22 as required by the Disability Chapter. Further, because Shoun withdrew his petition and there was no hearing, the State did not have the opportunity to present any evidence on this issue and was not able to cross-examine Shoun's witnesses or rebut Shoun's evidence.

Looking at the incomplete record on this issue, and with Shoun's own trial counsel conceding there was not enough evidence to prove Shoun's intellectual disability pursuant to the Disability Chapter, it cannot be said that the trial court committed fundamental error when it did not find on its own that Shoun had an intellectual disability.

## 2. Proportionality of Shoun's Sentence

Article 1, Section 16 of the Indiana Constitution provides in part: "All penalties shall be proportioned to the nature of the offense." Article 1, Section 16 requires us to review whether a sentence is not only within statutory parameters, but also constitutional as applied to the particular defendant. Knapp v. State, 9 N.E.3d 1274, 1290 (Ind. 2014), cert. denied, 135 S. Ct. 978, 190 L.

7

Ed. 2d 862 (2015). Our standard for an as-applied proportionality challenge depends on the type of penalty at issue. Id. at 1290. For habitual-offender enhancements, we assess the "nature and gravity" of the present felony, and then the "nature" of the prior felonies on which the enhancement is based. Id. (quoting Best v. State, 566 N.E.2d 1027, 1031 (Ind. 1991)). For penalties not based on prior offenses, we have undertaken a simpler inquiry into whether the penalty is "graduated and proportioned to the nature of [the] offense." Id. (citing Conner v. State, 626 N.E.2d at 803, 806 (Ind. 1993) (internal quotation marks omitted)).

Shoun argues that this LWOP sentence is unconstitutionally disproportionate as applied to him. His claim is based upon his alleged intellectual disability. He argues that despite his failure to comply with the statutory procedure for determining whether he has an intellectual disability, the legislative intent behind the Disability Chapter is that someone with a disability who commits murder should not face the death penalty or LWOP. He again asserts the record shows he has a disability. In response, the State points out that Shoun's assertion that he has an intellectual disability is not proven and thus, urges us to apply the two tests discussed in Knapp and find that Shoun's sentence is not unconstitutionally disproportionate.

Here, arguably both the test for a habitual offender enhancement and the proportionality test for penalties not based on prior offenses would apply. One of the two aggravators that made Shoun eligible for LWOP in this case was that he was subject to the custody of the Department of Correction at the time he committed the murder. Where a sentence of LWOP is imposed due to the defendant's status as a probationer at the time of the murder, this Court has applied the test for a habitual offender enhancement to assess the proportionality of an LWOP sentence. Knapp 9 N.E.3d at 1290. As such, we first assess both the nature and gravity of the current offense and the nature of the prior crimes upon which the enhancement is based. Id.

In this case, the nature of the current offense is particularly severe. As discussed above, Shoun murdered his 17-year-old girlfriend by stabbing her so many times that the coroner could not count the number of stab wounds. Additionally, the evidence shows that he stabbed her from inside her body, and that some of her organs were severed and removed. Finally, all of this occurred while Alter was still alive. While Shoun's prior offense, being a habitual traffic offender,

is not so severe, Shoun was given the privilege to serve his sentence for that prior offense on work release rather than in prison, and he abused that privilege by fleeing the work release facility and then committing murder. Also, because his prior crime was for his habitual offenses, this reflects his overall disregard for the law. Looking at these circumstances, LWOP is not disproportionate.

Shoun's LWOP penalty is not only based upon his status as a prior offender, but is also independently supported by the nature of his crime. That is, he mutilated Alter while she was still alive. When the penalty is not based on prior offenses, this Court undertakes "a simpler inquiry into whether the penalty is 'graduated and proportioned to the nature of [the] offense.'" Knapp at 1290 (quoting Conner, 626 N.E.2d at 806). Again, the nature of the offense here is so severe that it cannot be said that the LWOP penalty is disproportionate.

### 3. Appellate Rule 7(B)

Finally, Shoun argues that his sentence is inappropriate in light of the nature of the offense and his character pursuant to Indiana Appellate Rule 7(B). Indiana Appellate Rule 7(B) provides, "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The principal role of appellate review should be to attempt to leaven the outliers. . . but not achieve a perceived "correct" result in each case. Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. Anglemyer v. State, 868 N.E.2d 482, 494 (Ind.), as amended (July 10, 2007), decision clarified on reh'g, 875 N.E.2d 218 (Ind. 2007).

Shoun does not dispute the severe nature of the crime and focuses his argument on his character—that is, his alleged intellectual disability as evidenced by his low IQ and his "compromised psychological state." (Appellant's Brief 24.) He also urges this Court to consider that he was under the influence of drugs at the time of the offense and evidence that he was acting bizarre prior to and after the crime. Finally, he notes that he was abused as a child. He argues that his intellectual disability, psychological state and challenging childhood impact his culpability such that LWOP is not appropriate.

However, Shoun's arguments that his character makes his LWOP sentence inappropriate are

9

not persuasive. As discussed above, the true nature and quality of Shoun's alleged intellectual disability remains unknown because he withdrew his request to have the trial court properly evaluate this claim. Also, Shoun chose to partake in the synthetic marijuana, which he had used repeatedly and made him paranoid. Additionally, Shoun has an extensive criminal history, having accumulated convictions for misdemeanors (false informing, harassment, illegal consumption of alcohol, three offenses of driving without a license and displaying expired interim plates) and felonies (carrying a handgun without a license and offenses related to his habitual traffic violator status). For those offenses, he had received a variety of penalties including fines, suspended sentences, probation (which he violated at least twice), and eventually a five-year sentence for which he was supposed to be on work release when he committed this murder. Looking at the severe nature of the current offense and Shoun's character, which evidences disregard for the law, LWOP is not inappropriate.

## Conclusion

Shoun makes three arguments that his LWOP sentence is inappropriate, each hinged primarily on his assertion that he suffers from an intellectual disability. However, Shoun's own trial counsel did not believe he could make the required statutory showing to prove this intellectual disability and withdrew the petition for such a determination. Because the record on this issue is incomplete, the trial court did not commit fundamental error by not finding *sua sponte* that Shoun suffered from an intellectual disability. We also find that because the nature and quality of Shoun's alleged intellectual disability is uncertain and the nature of the crime so severe, Shoun's sentence is proportioned to the offense and thus, does not violate Article 1, Section 16 of the Indiana Constitution. Finally, looking at the severe nature of the crime and Shoun's character, Shoun's sentence is not inappropriate pursuant to Appellate Rule 7(B). Accordingly, we affirm the trial court's LWOP sentence.

Rush, C.J., Rucker, Massa and Slaughter, J.J., concur.

10