

**FILED**

Aug 21 2019, 8:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Randall Shields,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

August 21, 2019

Court of Appeals Case No.
19A-CR-271

Appeal from the Marion Superior
Court

The Honorable Mark D. Stoner,
Judge

Trial Court Cause No.
49G06-1708-F1-28990

**Brown, Judge.**

Randall Shields appeals his convictions and sentence on two counts of child molesting as level 1 felonies and strangulation as a level 6 felony. We affirm.

## Facts and Procedural History

In 2017, Shields lived with his thirteen-year-old daughter L.S. in a house in Indianapolis.[1] Shields slept on a couch in the front room of the house while L.S. slept on the floor. One day L.S. woke up to Shields touching her "whole body." Transcript Volume 2 at 139. Shields "kept telling [her] please," and she said "no." *Id*. He then pulled down her pants and underwear and "gave [her] oral sex." *Id*. She told him to stop, and he placed his hands on her throat and choked her. He told her to "give him oral sex," and she complied. *Id*. at 140. Shields then had sexual intercourse with L.S. for about ten minutes. Shields went back to the couch, and L.S. went to the bathroom and slept there. Weeks later after she missed her period and was throwing up, L.S. disclosed what had occurred to her mother, who took her to the hospital where she learned that she was pregnant. L.S. later went to Planned Parenthood because her mother wanted her to have an abortion. L.S. underwent a surgical termination of pregnancy in July 2017, and the procedure was painful. DNA testing comparing fetal tissue sample and a swab taken from Shields indicated that the probability of paternity by Shields was 99.9999 percent.

---

[1] L.S. testified that she and Shields lived at her grandmother's house. L.S.'s mother testified that L.S. and Shields lived at his grandmother's house.

[3]     In August 2017, the State charged Shields with: Count I, child molesting for performing or submitting to sexual intercourse with L.S., a child under fourteen years of age, as a level 1 felony; Count II, child molesting for performing or submitting to other sexual conduct with L.S., a child under fourteen years of age, as a level 1 felony; Count III, incest as a level 4 felony; Count IV, criminal confinement as a level 5 felony; and Count V, strangulation as a level 6 felony. The State also alleged Shields was an habitual offender.

[4]     At the start of the trial, the court told the jury: "All of you except for . . . the second alternate, have been back in the jury room. While you were there, you might have noticed there's a full-size refrigerator. There's a microwave there. That is for your usage. So if you want to bring in snacks, food, anything that makes you comfortable for the rest of the day, please know that that's there as well." *Id*. at 106-107. The State presented the testimony of L.S., her mother, the forensic nurse who examined L.S. at the hospital, a detective, the physician who performed the surgical abortion, an office coordinator and medical assistant for Planned Parenthood, and the forensic scientist with the Indiana State Police Laboratory who prepared a certificate of analysis. L.S. testified regarding Shields's actions. When asked why she went to Planned Parenthood, L.S. answered that her mother wanted her to have an abortion. She indicated the pregnancy was ultimately terminated, and when asked how that felt, she stated that it hurt. The State introduced the fetal remains as State's Exhibit No. 10 and a certificate of analysis containing the results of the DNA test as State's Exhibit No. 11. When eliciting testimony from the detective, the prosecutor

stated "I'm going to show you what I have marked as State's Exhibit 10 for identification" and asked what he recognized it to be, and the detective answered "[a]n envelope containing the product of conception related to this case." *Id*. at 178. After some discussion, State's Exhibit No. 10 was admitted without objection. Near the end of the day, the court told the jury when to arrive the following morning, to dress comfortably, and stated "I have no idea how long you will be here tomorrow" and, "[r]emember, you've got the refrigerator and you've got the microwave." *Id*. at 182.

[5] Shortly after the court reconvened the following morning, the prosecutor stated "we just had the detective open the product of conception outside the presence of the jury so didn't actually get it out in front of them," and the court stated "[v]ery good" and "[a]ppreciate that." *Id*. at 190. Shields's counsel stated that the abortion itself was graphic and horrible and that his understanding from speaking with the State's witnesses was that the abortion procedure was particularly traumatic and L.S. was in extraordinary pain, and he argued that evidence was highly prejudicial. The physician who performed the abortion testified regarding the procedure and the removal, collection, and examination of the fetal tissue. The physician testified that she rinsed the tissue and examined it and that the purpose of examining it was to ensure that the tissue was complete and that all uterine contents had been removed. The forensic scientist testified regarding the process for testing the samples and the results. The following exchange occurred between the court, prosecutor, and defense counsel:

[Prosecutor]: . . . As to the product of conception, it is my understanding is it has to get back in the freezer. Can the detective take that back downstairs as soon as we read jury instructions?

[Court Reporter]: I have taken a picture of it.

[Prosecutor]: Yes.

[Court Reporter]: I took a picture of it last night.

The Court: Defense, do you have any . . . objection to that?

[Defense Counsel]: Judge, I'm sorry, say that again.

[Prosecutor]: Just as soon as we're done with jury instructions, can we take the, the product of conception back to the freezer?

[Defense Counsel]: Yeah, so they don't want it up here.

The Court: Okay. Well, again, but I will need to explain that to the jury that -

[Defense Counsel]: That's right.

The Court: - all exhibits will be sent back except for that one and the only reason why we're sending that one back is because it's biohazardous and has to -

[Defense Counsel]: Yes, just -

The Court: - and has to remain in a frozen state.

[Defense Counsel]: Yes.

The Court: If they wish to examine it, we do have a freezer in the -

[Prosecutor]: We can leave it here until the end of -

The Court: Actually, no, this is how I'm going to handle that then. I'm going to tell them that the Bailiff will bring all the exhibits, including that. The Bailiff will put that particular exhibit in the freezer of the section of the Court's refrigerator. If they wish to review it, they may, but they are under

specific instruction to leave it in the freezer, handle it only with gloves, and then return it to the freezer immediately after they've examined it.

[Prosecutor]: Okay.

[Defense Counsel]: Okay. All right.

The Court: Well, you know, to a certain extent, -

[Defense Counsel]: It is what it is.

The Court: - they are citizens -

[Defense Counsel]: They are and they have a right to -

The Court: - and this is -

[Defense Counsel]: - review the evidence.

The Court: People have very different beliefs as to how they regard that and, so, again, it's an interesting euphemism that you all use the - what was it again, the -

[Defense Counsel]: Product of conception.

[Prosecutor]: Product of conception.

The Court: The product of conception. Interesting concept. Again, but people do have miscarriages all the time in which tissue is removed and why we've - I don't think the law, under certain, within certain stages of viability, doesn't recognize a distinction between the two.

[Prosecutor]: This is how the doctors referred to it. That's what -

The Court: So, on the other hand, the legislature continues to make new legislation, talking about the need for medical intervention of procedures or safety. To a certain extent, the taxpayers have a right to know whether there's really any validity to that argument or not. So, so that's why I chose not to totally sanitize the description. I don't know, what else can I tell you? So, everything in the jury?

The Bailiff: Yes, Your Honor.

Transcript Volume 3 at 11-13. The court instructed the jury:

> [T]he Court is sending back State's exhibit . . . No. 10, which is the fetal remains that were sent. I am not separating those out because you are entitled to all of those exhibits. That exhibit, however, is biohazardous and so the Court is sending it back to you. The Bailiff, when he sends it back to you, will put it in the freezer where it needs to remain in a frozen condition. If the jury or any individual member wishes to examine it, you have an absolute right to do so. But the Court is sending back biohazardous gloves for your protection so that you have them when you look at the exhibit or handle it. You are free to handle it, but once you are done, whoever is the foreperson, you were given specific instructions to return the exhibit to the freezer in the envelope in which it was contained. Okay? Any questions on that?

> Again, you're free to examine it, as you are any exhibit, if you wish. If you don't wish to, you don't have to. But if you do examine it, I'm giving you the gloves for your protection and just also giving you in the instruction that that exhibit and that exhibit, alone, needs to stay in the freezer until and unless you are examining it and then once you're done with it, needs to go back into the freezer immediately. Okay?

*Id*. at 19-20. The jury found Shields guilty as charged, and the court found that he was an habitual offender based on convictions for possession of cocaine in 2001 and 2003.

[6] At sentencing, L.S.'s mother indicated that L.S. attempted to commit suicide a couple of days before trial by attempting to overdose on medication. She testified that L.S. was in physical pain after the abortion for about a week or week and a half. L.S. testified regarding how Shields's actions have affected her. When asked how many pills she took before trial, she replied the whole bottle. The prosecutor stated that L.S. went to Planned Parenthood for a surgical abortion and that, because Planned Parenthood was a medical center

as opposed to a hospital, it was unable to provide a certain level of sedation and L.S. had to endure great physical pain.

[7] The presentence investigation report showed that Shields was born in January 1977 and that his criminal history includes convictions for possession of a narcotic drug in 1997; two counts of possession of marijuana as class A misdemeanors in 1999; carrying a handgun without a license as a class A misdemeanor in 2000; possession of cocaine as a class C felony in 2001; possession of cocaine as a class B felony in 2003; driving while suspended as a class A misdemeanor and public intoxication as a class B misdemeanor in 2010; operating while intoxicated as a class A misdemeanor in 2011; driving while suspended as a class A misdemeanor in 2012; driving while license suspended as a class A misdemeanor in 2013; operating while intoxicated as a level 6 felony in 2015; and operating while intoxicated as a level 6 felony in 2017. It also states Shields has had twenty-four adult arrests or summonses. The State requested that the court give Shields aggravated sentences, order the sentences to be served consecutively, and give him the maximum on the habitual offender enhancement.

[8] The trial court did not enter judgments of conviction on Counts III and IV due to double jeopardy concerns. The court stated that it was mindful that Shields indicated that he was molested when he was younger. It further noted Shields's prior criminal history. The court stated that Shields indicated that he has some sorrow for making his daughter testify but that the evidence also showed that she tried to take her life within a week of the trial. The court also stated it was

mindful that the offenses were part of a singular episode but that the incident resulted in pregnancy and an abortion. It stated that it would order concurrent sentences because the offenses were part of one continuous criminal act, and sentenced Shields to concurrent terms of thirty-eight years enhanced by fifteen years for being an habitual offender for his conviction under Count I, thirty-eight years for his conviction under Count II, and two years for his conviction under Count V, for an aggregate sentence of fifty-three years.

*Discussion*

I.

Shields contends that "sending fetal remains to the jury room during deliberations presented an enormous risk of prejudice and improper use while offering no potential aid to the jurors in assessing whether Shields was guilty of the charged crimes." Appellant's Brief at 11. He argues that fetal remains are entitled to dignity and points to Ind. Code § 16-34-3-4(a).[2] He asserts that the jurors heard testimony from a DNA analyst and the report with her conclusions was sent to the jury room, and "the fetal remains presented a high risk of undue prejudice by injecting the multi-faceted and often emotional abortion issue into

---

[2] Ind. Code § 16-34-3-4(a) provides:

> An abortion clinic or health care facility having possession of an aborted fetus shall provide for the final disposition of the aborted fetus. The burial transit permit requirements of IC 16-37-3 apply to the final disposition of an aborted fetus, which must be interred or cremated. . . . Aborted fetuses may be cremated by simultaneous cremation.

Ind. Code § 23-14-31-5 provides that "'burial transit permit' means a permit for the transportation and disposition of a dead human body required under IC 16-37-3-10 or IC 16-37-3-12."

deliberations, which may well cause heightened animosity toward Shields." *Id.* at 16. He states that Indiana has enacted a statute "that provides an aborted fetus is entitled to dignified and respectful care—care that is not found in a refrigerator in a jury room or while being inspected or passed around a table," and the remains could be subjected to improper use by the jurors. *Id.* He further argues that no objection was required, trial courts have an affirmative duty to maintain a fair trial, and even if an objection was required, a new trial is still warranted.

[10] The State contends that Shields's counsel expressly endorsed the court's action of sending all of the exhibits, including State's Exhibit No. 10, into deliberations and in so doing invited any error, and that, even if not invited error, Shields has not shown fundamental error. It argues that State's Exhibit No. 10 provided substantial evidence that Shields had engaged in sexual intercourse with L.S. and that, "[t]o the extent he claims prejudice from the multi-faceted and often emotional abortion issue being injected into deliberations, that issue was not raised solely by Exhibit 10, but by the admissible trial testimony of the witnesses recounting the ordeal through which L.S. had to suffer because of Shields's acts." Appellee's Brief at 13 (internal quotations omitted). It further asserts: "Shields also argues prejudice because this handling of fetal remains may have been inconsistent with statutes regulating such handling, but whatever technical statutory irregularities occurred had no bearing on whether he actually received a fair trial." *Id.* at 13-14. The State maintains that Shields cannot show fundamental error because

the evidence of his guilt is overwhelming and points to L.S.'s unequivocal testimony and the results of the paternity testing.

[11] The Indiana Supreme Court has stated, "[w]hen the failure to object accompanies the party's affirmative requests of the court, it becomes a question of invited error" and "[t]his doctrine—based on the legal principle of estoppel—forbids a party from taking advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct." *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018) (citations and internal quotations omitted). The record reveals that, when the trial court stated that it would send State's Exhibit No. 10 to the jury room with instructions, Shields's defense counsel stated "Okay. All right" and "[i]t is what it is." Transcript Volume 3 at 12. Moreover, defense counsel stated "they have a right to . . . review the evidence." *Id*. at 13. We conclude that any error in sending State's Exhibit No. 10 to jury room during deliberations was invited error.

[12] However even assuming the invited error doctrine is inapplicable, reversal is not required. To the extent that Shields did not affirmatively request the trial court to send State's Exhibit No. 10 to the jury room but was required to object and did not do so, he must show that the trial court's decision constituted fundamental error. *See Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013) (observing that failure to object at trial waives the issue for review unless fundamental error occurred). Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to

make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). To establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm. *Id.* The element of such harm is not established by the fact of ultimate conviction but rather depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled. *Id.* In evaluating the issue of fundamental error, we look at the alleged error in the context of all that happened and all relevant information given to the jury, including evidence admitted at trial, closing argument, and jury instructions, to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *See id.*

[13] Shields does not challenge the admission of State's Exhibit No. 10 into evidence; rather, he asserts the exhibit should not have been delivered to the jury room during deliberations. The Indiana Supreme Court has held that "the trial court should consider three factors in deciding whether to permit the jury to take a copy of the exhibits into the jury room" which include: whether the material will aid the jury in a proper consideration of the case; whether any party will be unduly prejudiced by submission of the material; and whether the material may be subjected to improper use by the jury. *Thacker v. State*, 709 N.E.2d 3, 7 (Ind. 1999) (citing *Robinson v. State,* 699 N.E.2d 1146, 1150 (Ind.

1998)), *reh'g denied*. Also, the Court has held, in the context of the admission of photographs, that a defendant is not entitled to a sanitized presentation of the evidence. *See Reaves v. State*, 586 N.E.2d 847, 859 (Ind. 1992) (citing *Shelton v. State*, 490 N.E.2d 738, 743 (Ind. 1986)).

[14]   In this case, the extent to which the challenged exhibit aided the jury in considering the case may have been minimal. However, with respect to whether any party would be unduly prejudiced by submission of the material, the record shows that the trial court wished for the jury to have all of the exhibits, including State's Exhibit No. 10, in the jury room. The exhibit was not provided in isolation. The exhibit had been admitted into evidence, and the jury heard testimony regarding the surgical procedure and removal of the fetal tissue, the chain of custody, and the testing performed on a sample of the tissue. The court commented that it did not wish to sanitize the evidence. The State presented the testimony of L.S. regarding Shields's actions and the abortion. The operating physician testified regarding the procedure. Moreover, the State presented the testimony of the forensic scientist who compared a sample of the tissue to a swab taken from Shields and evidence that the probability of paternity was 99.9999 percent. Considering the evidence as a whole and all information given to the jury, we are not persuaded that the jury was unduly prejudiced by the court's decision to have State's Exhibit No. 10 available in the jury room, and there is no indication the material was subjected to improper use by the jury. Shields has not established that he was deprived of a fair trial or that a blatant violation of principles of due process occurred. While we cannot

say that reversal is warranted in this case, we encourage trial courts to proceed with caution in deciding to send fetal remains or any biohazardous exhibit to the jury room during deliberations, to provide a proper and separate area or refrigerator for storing any such exhibits, and to carefully consider the factors set forth in *Thacker* before deciding whether to send the exhibit to the jury room.

## II.

[15] Shields next claims that his sentence is disproportionate under Article 1, Section 16 of the Indiana Constitution, which provides that "[a]ll penalties shall be proportioned to the nature of the offense." For habitual-offender enhancements, we assess the nature and gravity of the present felony and the nature of the prior felonies on which the enhancement is based. *Shoun v. State*, 67 N.E.3d 635, 641 (Ind. 2017). For penalties not based on prior offenses, we assess whether the penalty is graduated and proportioned to the nature of the offense. *Id.*

[16] Shields argues that, while his child molesting offense is among the most serious, it occurred during a singular episode. He further argues that his prior convictions were almost entirely related to substance abuse and that his convictions for drug possession did not share a distinct nexus with the molesting offenses. He requests that his habitual offender enhancement be reduced to a term closer to the minimum of six years.

[17] The State maintains that Shields's sentence is not constitutionally disproportionate; the nature of his offenses are appalling; he impregnated his

thirteen-year-old daughter, choked her, performed oral sex on her, and made her perform oral sex on him; and the offenses resulted in extraordinary trauma. It further argues that his sentence is not disproportionate considering his criminal history, that the possession of cocaine is grave in nature, and that, while there may be no distinct nexus between the enhancing convictions and his present crime, the extent of his criminal history renders any claim of disproportionality meritless. It asserts that his sentence is not one that would shock public sentiment and violate the judgment of reasonable people. In reply, Shields notes that he is not diminishing the gravity of the instant offense but focusing on the lengthy habitual enhancement based on his possession of cocaine convictions in 2001 and 2003.

[18] Ind. Code § 35-50-2-8 provides that the court shall sentence a person found to be an habitual offender to an additional fixed term that is between six and twenty years for a person convicted of a level 1 felony and that the additional term is nonsuspendible. The court sentenced Shields to thirty-eight years for his conviction for child molesting as a level 1 felony under Count I and enhanced the sentence by fifteen years for being an habitual offender.

[19] The record reveals that Shields strangled his thirteen-year-old daughter, performed oral sex on her, forced her to perform oral sex on him, and had sexual intercourse with her, resulting in her pregnancy. L.S. has experienced significant trauma. She underwent a painful abortion and attempted to commit suicide. Shields's criminal history is extensive and includes prior felony and misdemeanor convictions and numerous arrests or summonses. His sentence

under Count I was enhanced by fifteen years for being an habitual offender, but the court also ordered that his sentences under Counts I, II, and V be served concurrently on the basis that they were part of one continuous criminal act. We conclude that Shields has not demonstrated that his sentence is disproportionate.

[20] For the foregoing reasons, we affirm Shields's convictions and sentence.

[21] Affirmed.

Kirsch, J., and Altice, J., concur.