## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 06 2020, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott H. Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Barbara Brewster,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 6, 2020

Court of Appeals Case No.
19A-CR-1860

Appeal from the St. Joseph
Superior Court

The Honorable John M.
Marnocha, Judge

Trial Court Cause No.
71D02-1807-MR-4

**Najam, Judge.**

# Statement of the Case

Barbara Brewster appeals her sentence following her conviction for murder, a felony. Brewster raises one issue for our review, namely, whether her sentence is inappropriate in light of the nature of the offense and her character.

We affirm.

# Facts and Procedural History

In June 1988, Miriam Rice lived with her husband, Jeff. The two had a two-year-old son and a dog, and Miriam was four and one-half months pregnant with the couple's second child. Miriam was "in great physical condition," so "[y]ou knew she was pregnant." Tr. Vol. 4 at 73. Miriam and Jeff would often take turns walking their dog. At approximately 11 p.m. on June 24, Miriam left to walk the dog, and Jeff stayed at home with their son.

That same night, Brewster was camping at Pinhook Park with George Kearny. With them was Brewster's seven-year-old-daughter, Paula Brooks, and five-year-old son, Robert South. At some point that night, Brewster, Kearny, and Robert left the park in Kearny's van to get food, and Brooks stayed in the tent. While they were driving, they saw Miriam walking. Kearney stopped the car, got out, and "went over to" Miriam. Tr. Vol. 5. at 8. South then heard "screaming," and he saw Kearny "grab" Miriam, drag her to the van, and throw her in through the side door. *Id*. at 8, 9. Kearny then told Brewster that "she could kill [Miriam] or he could kill" Brewster and her children. *Id*. at 10.

[5] Brewster was "scared" and felt like she "had no choice," so she "[b]ashed [Miriam's] skull in." *Id*. at 10. South saw Miriam "trying to hold her stomach and hold her face[.]" *Id*. at 11. South also heard Miriam "begging, crying with what she had left in her." *Id*. From the campsite, Brooks was able to hear Miriam "screaming" and "begging for her life and for the life of her baby." *Id*. at 52. South saw Brewster strike Miriam twice, but then "everything was going dark in [his] eyes" and "it was like [he] wasn't even there." *Id*. at 10.

[6] At some point, the three returned to the campsite. South did not see any blood, but he "could feel it all over" him. *Id*. at 11. Brewster told Brooks to clean the blood off of South, so Brooks took South's clothes from him and put them in a pile, and she used rags to wipe off the blood. Brooks then asked Brewster what had happened, but Brewster did not answer her. Brewster was acting "[a]s if nothing had happened." *Id*. at 55. The next morning, Brewster told Brooks to clean out the van. When Brooks looked in the van, she saw "blood everywhere," including a "puddle" of blood on the floor and blood splattered on the roof, seats, and doors. *Id*. at 57, 58. Brooks then cleaned up the blood using rags and water that Brewster had given her. While she was cleaning the car, Brooks found a bra, an earring, and a purse that did not belong to them. Brooks took those items and the rags to Kearny, who burned them along with everyone's clothes from the night before.

[7] After Miriam did not return from her walk, Jeff became worried, so he went outside to look for her. When he did not find her, he called 9-1-1 to report that his wife was missing. Jeff then called family and friends to help him look for

Miriam. At one point, approximately "30 to 40 people" were looking for Miriam. Tr. Vol. 4 at 68. News channels also reported that Miriam was missing.

[8] Shortly after their camping trip, Brewster and Brooks went to the home of Helen Partin, Brewster's sister. While there, Brooks told Partin about what Brooks had experienced at the campsite. It then "came across the news" that Miriam was missing near Pinhook Park. Tr. Vol. 5 at 64. Brooks turned to Partin and said: "See, that's what I'm talking about." *Id*. At that point, Brewster "hit" Brooks "in [her] face" and told her to "shut [her] mouth." *Id*.

[9] On June 29, five days after she had gone missing, someone found Miriam's body in Pinhook Park, which was approximately two miles from Miriam's home. Miriam did not have any clothes on from the waist up. Doctor Rick Hoover, a forensic pathologist, went to the location where Miriam's body was found. There, he was able to observe that "the entire top" of Miriam's skull was missing. Tr. Vol. 4 at 126. He was also able to see that "there were large pieces of skull" next to her body and "in her skull cavity itself." *Id*. at 127.

[10] Doctor Hoover then conducted an autopsy of Miriam. During the autopsy, he observed an "extensive fracture" and a "ten-inch defect" on the top of her head. *Id*. at 126. Doctor Hoover also noted that the "majority" of the twenty-two bones in Miriam's skull had been fractured. *Id*. at 142. Doctor Hoover was able to conclude that Miriam had been struck a "minimum" of three times to her head with a blunt weapon, and that "[a]ny of the three" strikes could have

killed her. *Id*. at 143, 149. Doctor Hoover also observed "scattered blunt trauma" over the back and front of her body. *Id*. at 129. Based on her injuries, Doctor Hoover determined that Miriam had died from blunt force trauma to her head and that her death was a homicide.

[11] In 2018, the State charged Brewster with murder, a felony.[1] Following a jury trial, the jury found Brewster guilty as charged, and the trial court entered judgment of conviction. At sentencing, the court identified several aggravating factors. The court also found that there were no mitigating factors that "come close to outweighing or equaling any of the aggravating factors." Tr. Vol. 6 at 9. Accordingly, the court imposed the maximum sentence of sixty years in the Department of Correction. This appeal ensued.

## Discussion and Decision

[12] Brewster contends that her sentence is inappropriate in light of the nature of the offense and her character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This court has recently held that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed."

---

[1] The crime remained unsolved until Kearny came forward and spoke to police in mid-2015. As a result of Kearny's conversation with police, the State also charged him with murder. Kearny pleaded guilty to that charge without the benefit of a plea agreement. *See* Appellant's App. Vol. II at 102-03.

*Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has recently explained that:

> The principal role of appellate review should be to attempt to leaven the outliers . . . but not achieve a perceived "correct" result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind.), as amended (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

*Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (omission in original).

[13] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[14] At the sentencing hearing, the parties acknowledged that the sentencing range for murder has been amended numerous times since 1988. However, the parties agreed that the relevant sentencing range is forty years to sixty years, with a presumptive sentence of fifty years. *See* Tr. Vol. 6 at 4. Here, the trial court identified as an aggravating factor the nature and brutality of the offense. Specifically, the court found that the offense "shakes the core of any decent, moral person." *Id*. at 7. The court also identified as aggravating factors the lack of connection between Brewster, Kearny, and Miriam; the fact that Brewster committed the offense in the presence of her five-year-old son; the fact that Brewster had her seven-year-old daughter clean up the mess; and Brewster's criminal history. And the court did not identify any mitigating factors. Accordingly, the court imposed the maximum sentence of sixty years.

[15] On appeal, Brewster acknowledges that the offense was brutal and that it had an "apparent lack of motive." Appellant's Br. at 8. However, she contends that her sentence is inappropriate in light of the nature of the offense because Kearny "forced" her to murder Miriam.[2] *Id*. And she contends that her sentence is inappropriate in light of her character because she "was suffering from mental illness" at the time of the offense and because she had been suffering from "severe alcohol abuse." *Id*. at 9.

---

[2] To the extent Brewster asserts that the trial court abused its discretion when it sentenced her because it did not find her duress to be a mitigating factor, Brewster has not supported that contention with cogent argument. Accordingly, she has waived that purported issue. *See* Ind. Appellate Rule 46(A)(8)(a).

[16] However, Brewster has not met her burden on appeal to demonstrate that her sentence is inappropriate. With respect to the nature of the offense, Brewster brutally attacked and killed Miriam, who was a stranger to Brewster. In particular, Brewster hit Miriam in the head with a blunt object at least three times, which strikes fractured the "majority" of the twenty-two bones in Miriam's skull and removed "the entire top" of the skull. Tr. Vol. 4 at 126, 142. Further, Miriam was visibly pregnant when Brewster murdered her. Indeed, Jeff testified that "[y]ou could tell [Miriam] was pregnant." *Id.* at 73. And Brooks testified that she could hear Miriam screaming and "begging for her life and for the life of her baby," which screams were loud enough for Brooks to hear from the tent at the campsite. Tr. Vol. 5 at 52.

[17] In addition, Brewster committed the murder in front of her five-year-old son. Indeed, South saw Brewster hit Miriam twice. And South could feel Miriam's blood "all over" him. *Id.* at 11. Further, Brewster forced her seven-year-old daughter to clean up the blood inside the van. As a result of witnessing the offense, South has attempted to commit suicide multiple times, and he continues to suffer from night terrors. Brewster has not any evidence, much less compelling evidence portraying the nature of the offense in a positive light. *See Stephenson*, 29 N.E.2d at 122.

[18] As to her character, Brewster has a criminal history that includes one prior felony conviction for attempted voluntary manslaughter and several misdemeanor convictions, and she has had her probation revoked twice. Further, after she murdered Miriam, she acted "[a]s if nothing had happened."

Tr. Vol. 5 at 55. And when Brooks attempted to tell her aunt about what had happened at the park, Brewster "hit [Brooks] in [her] face and told [her] to shut [her] mouth." *Id*. at 64. In other words, Brewster was willing to harm her own young child to ensure that her child did not speak, which reflects poorly on her character. We cannot say that Brewster's sentence is inappropriate in light of her character. We therefore affirm her sentence.

[19] Affirmed.

Kirsch, J., and Brown, J., concur.