# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 28 2019, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lincoln Ray Pickett, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 28, 2019 <br><br> Court of Appeals Case No. 18A-CR-2791 <br><br> Appeal from the Lawrence Superior Court <br><br> The Honorable William G. Sleva, Judge Pro Tempore <br><br> Trial Court Cause Nos. 47D01-1602-MR-129 47D01-1601-F6-105 |

**Najam, Judge.**

# Statement of the Case

Lincoln Ray Pickett appeals his convictions for murder, a felony, and unlawful possession of a firearm by a serious violent felon, a Level 4 felony, and he appeals his sentence for those and other convictions[1] following a jury trial. Pickett presents three issues for our review:

> 1.      Whether the trial court erred when it admitted evidence that law enforcement officers had seized pursuant to a search of his residence.
>
> 2.      Whether some of his convictions constitute an episode of criminal conduct and require a sentence revision.
>
> 3.      Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

# Facts and Procedural History

On January 18, 2016, Pickett drove Kamie Ratcliff and her infant daughter to Pickett's home with his wife Jasmine Pickett ("Jasmine") and their three children. Kamie and her daughter stayed with the Picketts for three nights. On

---

[1] Pickett was also convicted of obstruction of justice, a Level 6 felony; abuse of a corpse, a Level 6 felony; false informing, as a Class A misdemeanor; and failure to report a dead body, a Class A misdemeanor. In his prayer for relief in his brief on appeal, Pickett *purports* to request that we vacate all of his convictions. However, in his opening statement at trial, Pickett's defense counsel explicitly stated that Pickett was "guilty" of each of the offenses listed above and only contested the murder charge. Tr. Vol. 5 at 61. Because Pickett expressly conceded his guilt at trial, to the extent he appeals those convictions here, any alleged error was invited. *See Brewington v. State*, 7 N.E.3d 946, 975 (Ind. 2014).

the morning of January 21, Kamie told the Picketts that she wanted to go home. Jasmine, Kamie, and Kamie's daughter got into Pickett's red Chevrolet Blazer, with Pickett in the driver's seat. As they were driving, Kamie asked Pickett to drive her to a friend's house, but Pickett refused. Pickett told Kamie that he would drive her to her boyfriend's house or to her mother's house. Kamie became angry and threatened that both Pickett and Jasmine would "go to jail." Tr. Vol. 7 at 37. Pickett became angry and yelled at Kamie. Kamie, who was sitting in the back seat with her daughter, hit Pickett. And at some point, Pickett hit Jasmine so hard that Jasmine lost consciousness. A short time later, Jasmine heard a gunshot and regained consciousness. Pickett had shot Kamie in the head. Pickett told Jasmine to put her head down, and she complied. Jasmine heard "gurgling" sounds coming from the back seat of the vehicle. *Id.* at 44.

[4] Pickett drove to his home. Jasmine got out of the Blazer, Pickett backed the Blazer into the garage, and Pickett "handed [Jasmine] the baby." *Id.* at 48. Jasmine took Kamie's daughter inside the home. At some point, Pickett left for a few hours and came home. The next day, January 22, Pickett drove to his sister's house. Pickett told his sister, Allayna O'Neal, that he needed a "safe vehicle to drive." Tr. Vol. 5 at 81. Pickett also showed O'Neal a small pistol and two knives, and he told her that he had "shot a girl in the face." *Id.* at 86. Pickett explained that "the girl" was in the backseat of his Blazer when she had threatened to accuse him of "criminal confinement" and had "started punching him in the head." *Id.* Pickett told O'Neal not to tell anyone.

[5] At some point, O'Neal's boyfriend, Mel Roush, came home, and he agreed to let Pickett borrow his Subaru. Accordingly, the three of them drove three vehicles, including the Subaru and Pickett's Blazer, to Pickett's house. When they arrived, O'Neal saw a baby there, and someone told her that Jasmine was babysitting the baby. After a short time, Kamie's mother and stepfather arrived to pick up Kamie's daughter. Jasmine had called Kamie's mother and said that she and Pickett "didn't know where Kamie was" and had asked her to "come pick up the baby." Tr. Vol. 7 at 52. Kamie's stepfather returned to the Picketts' home the following day looking for Kamie, but Pickett and Jasmine told him that "they had no idea where she was at." Tr. Vol. 5 at 139. On January 24, Kamie's mother filed a missing person report with the Mitchell Police Department.

[6] On January 28, Pickett asked Jasmine to help him get Kamie's body out of the Blazer. Jasmine saw Kamie's body wrapped in a sheet in the backseat, and she saw Kamie's feet. Jasmine told Pickett that she could not help him, and she proceeded to the front yard. Pickett then put Kamie's body into a wood pile and started a fire. Pickett found Jasmine on the front porch and gave her a gun, and he told her to put the gun away. Jasmine took the gun and put it underneath their mattress inside the house.

[7] After a short time, officers with the Mitchell Police Department arrived at Pickett's home. The officers had a search warrant to look for evidence related to Kamie. Officers questioned Pickett and Jasmine separately, and they observed the fire in the burn pile. At one point, an officer started poking

around the fire, and he saw what looked like a human "spinal column and rib cage" in the fire. *Id.* at 197. The officers arrested Pickett and Jasmine. Officers thereafter obtained and executed an additional search warrant for Pickett's home and a search warrant for his Blazer.[2]

[8] The State initially charged Pickett with unlawful possession of a firearm by a serious violent felon, a Level 4 felony; obstruction of justice, a Level 6 felony; abuse of a corpse, a Level 6 felony; two counts of false informing, as Class A misdemeanors; and failure to report a dead body, a Class A misdemeanor. The State then charged Pickett with murder under a separate cause number. Pickett moved to suppress the evidence and alleged that the search of his home was unconstitutional. The trial court denied that motion following a hearing. Prior to trial, the State dismissed one count of false informing. A jury found Pickett guilty as charged on all counts but unlawful possession of a firearm by a serious violent felon. The trial was bifurcated, and the trial court found Pickett guilty on that count. The trial court entered judgment of conviction accordingly and sentenced Pickett to an aggregate term of eighty-four years executed. This appeal ensued.

---

[2] At some point, Pickett had removed from the Blazer door panels and trim pieces because of blood spatter.

# Discussion and Decision

## *Issue One: Search Warrant*

Pickett first contends that the trial court "abused its discretion in admitting all of the evidence at trial obtained from the issuance of the search warrants." Appellant's Br. at 12. Pickett maintains that the search warrants were not supported by probable cause and should not have been issued. We cannot agree.

As our Supreme Court has explained,

> [t]he existence of probable cause is evaluated pursuant to the "totality-of-the-circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983). Probable cause exists "when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *U.S. v. Grubbs*, 547 U.S. 90, 95, 126 S. Ct. 1494, 1499, 164 L.Ed.2d 195 (2006) (quoting *Gates*, 462 U.S. at 238, 103 S. Ct. 2317). Significantly, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 245 n.13, 103 S. Ct. 2317. The trial court's task is to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place[,]" *id.* at 238, 103 S. Ct. 2317, while a reviewing court must "ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-39, 103 S. Ct. 2317 (quoting *Jones v. US*, 362 U.S.257, 271, 80 S. Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

*Eaton v. State*, 889 N.E.2d 297, 299 (Ind. 2008).

[11] Here, in support of the application for the first search warrant, Mitchell Police Department officer Matt England testified at a probable cause hearing that: Kamie's mother had reported Kamie missing on January 24, 2016; "at the time [Kamie] was last seen she was residing with" Pickett and Jasmine at Pickett's home; Pickett and Jasmine confirmed that Kamie had stayed with them but then "left without them knowing"; Kamie's mother was concerned that Kamie "had not returned for the child"; the father of Kamie's three older children said they had not heard from Kamie for over one week, which was "out of the ordinary"; Kamie usually checked on her older children "every couple of days"; it was reported that Kamie might have been using "illegal substances"; and "law enforcement [was] concerned about her welfare" at that time. Appellant's App. Vol. 2 at 196-201.

[12] Pickett asserts that, without any testimony, that "any illegal activity had occurred at Pickett's home" and, given the "numerous plausible, legal reasons why [Kamie] could not be located," there was no probable cause to support the initial search warrant of his home. Appellant's Br. at 13. Pickett adds that "the officer failed to make any connection [between] Kamie's disappearance and the items police believed might be found in the home." *Id.* Pickett's argument misses the mark.

[13] Here, at the time of the probable cause hearing, Kamie had been reported missing for several days. Pickett and Jasmine confirmed that no one had seen Kamie since she had last been seen at their home, where she had been living for a few days. Inexplicably, Pickett and Jasmine had Kamie's infant daughter in

their care, and Kamie had not contacted her older children for more than one week, which was unusual for her. We hold that Officer England's testimony sufficiently established probable cause for the initial search warrant for Pickett's home. Once there, officers found human remains in the burn pit and obtained additional warrants. The evidence supports the trial court's determination that sufficient probable cause supported the search warrants. We hold that the trial court did not err when it admitted the evidence officers obtained pursuant to those search warrants.

### Issue Two: Episode of Criminal Conduct

Pickett next contends that some of his offenses constitute an episode of criminal conduct and are subject to a sentencing cap. An "episode of criminal conduct" means offenses or a connected series of offenses that are closely related in time, place, and circumstance. Ind. Code § 35-50-1-2(b) (2018). And Indiana Code Section 35-50-1-2(c) provides in relevant part that, except for crimes of violence, the total of the consecutive terms of imprisonment to which the defendant is sentenced for multiple felony convictions arising out of an episode of criminal conduct "shall not exceed the period described in subsection (d)." Subsection (d) provides in relevant part that

> the total of the consecutive terms of imprisonment to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct may not exceed the following: (1) If the most serious crime for which the defendant is sentenced is a Level 6 felony, the total of the consecutive terms of imprisonment may not exceed four (4) years. . . .

*Id.*

[15] Here, Pickett maintains that "the total of the consecutive terms of imprisonment, with the exception of the sentences for murder and for the [serious violent felon] conviction, could not exceed 4 years[.]" Appellant's Br. at 15. In other words, Pickett asserts that the offenses underlying his convictions other than for murder and unlawful possession of a firearm constitute an episode of criminal conduct. However, as the State correctly points out, the episode of criminal conduct sentencing cap only applies to *felony* convictions. Accordingly, Pickett can only challenge his sentences for obstruction of justice and abuse of a corpse. We thus address whether those two offenses constitute an episode of criminal conduct.

[16] Our supreme court has explained that, in determining whether multiple offenses constitute an episode of criminal conduct, the focus is on the timing of the offenses and the simultaneous and contemporaneous nature of the crimes. *See Reed v. State*, 856 N.E.2d 1189, 1200 (Ind. 2006). Our courts have also held that, where a complete account of a crime can be given without referring to the other offense, the offenses are not a single "episode of criminal conduct." *Tedlock v. State*, 656 N.E.2d 273, 276 (Ind. Ct. App. 1995). However, our Supreme Court has stated that our courts' emphasis on the "complete account" analysis "is a bit of an overstatement." *Reed*, 856 N.E.2d at 1200. The Court explained:

> We are of the view that although the ability to recount each charge without referring to the other can provide additional

guidance on the question of whether a defendant's conduct constitutes an episode of criminal conduct, it is not a critical ingredient in resolving the question. Rather, the statute speaks in less absolute terms: "a connected series of offenses that are closely connected in time, place, and circumstance." I.C. § 35-50-1-2(b). And as we have observed, "*Tedlock* emphasizes the timing of the offenses" and "refers to the 'simultaneous' and 'contemporaneous' nature of the crimes which would constitute a single episode of criminal conduct." *Smith v. State*, 770 N.E.2d 290, 294 (Ind. 2002) (citing *Tedlock*, 656 N.E.2d at 276).

*Id.*

[17] Here, Pickett committed obstruction of justice when he "altered or damaged or removed from [the] crime scene[, the Blazer,] Kamie's body, 2 door panels, multiple pieces of trim," and the baby's car seat. Tr. Vol. 8 at 39. And he committed abuse of a corpse when he burned Kamie's body. On appeal, Pickett contends as follows:

> It is true that the State alleged the offenses did not all occur on the same day. Yet it was unclear from the evidence presented when Pickett took apart the Blazer and began burning Kamie's body. Nevertheless, offenses in a single episode of criminal conduct can occur over a period of time, so long as they are closely related in place and circumstance, as they were in this case. The offenses, with the exception of the murder, occurred at Pickett's home, and each offense was a circumstance related to Kamie's murder.

Appellant's Br. at 17.

In short, Pickett emphasizes the relationship of the crimes to each other rather than the timing of the offenses. But we cannot say that "a complete account" of each offense cannot be given without referring to the other offense. *Tedlock*, 656 N.E.2d at 276. Pickett destroyed evidence of the murder found in the Blazer, and he burned Kamie's dead body. Those acts are related only in that they were both efforts to cover up the murder, but they are distinct in that they can each be described without reference to the other. Moreover, without evidence that the obstruction of justice and abuse of a corpse occurred simultaneously or contemporaneously, or even when they occurred, we cannot say that these two offenses constitute an episode of criminal conduct. *See Reed*, 856 N.E.2d at 1200.

### Issue Three: Sentence

Finally, Pickett contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This Court has often recognized that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has explained that "[t]he principal role of appellate review should be to attempt to leaven the outliers . . . but not achieve a perceived 'correct' result in each case. Defendant has the burden to persuade

us that the sentence imposed by the trial court is inappropriate." *Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (citations omitted; omission in original).

[20] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[21] Here, the trial court imposed the maximum possible sentence of eighty-four years executed.[3] Pickett contends that his sentence is inappropriate in light of the nature of the offenses. In particular, Pickett "does not dispute that Kamie's

---

[3] The trial court imposed consecutive maximum sentences as follows: sixty-five years for murder; twelve years for unlawful possession of a firearm by a serious violent felon, a Level 4 felony; two and a half years each for obstruction of justice and abuse of a corpse, each Level 6 felonies; one year for false informing, as a Class A misdemeanor; and one year for failure to report a dead body, a Class A misdemeanor.

murder occurred in front of her young daughter, which made this murder more egregious than others. But there was nothing remarkable about Pickett's other offenses that would call for the maximum sentence on each one." Appellant's Br. at 18. We are not persuaded. Pickett has not directed us to "compelling evidence portraying in a positive light" the nature of the offenses. *Stephenson*, 29 N.E.3d at 122. Accordingly, we defer to the trial court and cannot say that his sentence is inappropriate in light of the nature of the offenses. *Id.*

[22] Pickett next contends that his sentence is inappropriate in light of his character. Pickett points out that he had "a difficult childhood"; only completed the sixth grade in school; was employed but "had stress and anxiety" due to "financial instability"; relied on marijuana "to ease his anxiety"; and had a "good relationship" with his four children. Appellant's Br. at 19. Pickett asserts that his offenses are not "the worst" and he is not "the most depraved" of offenders. *Id.*

[23] Pickett's criminal history includes multiple adjudications as a juvenile delinquent in 1998 and 1999, including adjudications for burglary, theft, receiving stolen property, marijuana possession, and carrying a handgun without a license. Pickett's adult criminal history includes four misdemeanors, including battery and resisting law enforcement. In addition, Pickett violated the terms of his probation in 2002. Moreover, as the State points out, Jasmine testified that Pickett was physically and psychologically abusive to her. Finally, Pickett has not directed us to evidence of any "substantial virtuous traits or persistent examples of good character" to support a revision of his sentence

based on his character. *Stephenson*, 29 N.E.3d at 122. We cannot say that Pickett's sentence is inappropriate in light of his character, and we affirm his sentence.

[24] Affirmed.

Bailey, J., and May, J., concur.