

FILED

Apr 10 2019, 5:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Joas & Stotts
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Curtis S. Gridley,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 10, 2019

Court of Appeals Case No.
18A-CR-1274

Appeal from the Ripley Circuit
Court

The Honorable Ryan J. King,
Judge

Trial Court Cause No.
69C01-1703-F4-5

**May, Judge.**

[1] Curtis S. Gridley appeals his convictions of Level 4 felony attempt to manufacture methamphetamine[1] and Level 6 felony theft.[2] He presents three issues that we restate as:

1. Whether the trial court abused its discretion when it replaced a juror during the presentation of evidence;

2. Whether the admission of testimony in contravention to the order in limine constituted fundamental error; and

3. Whether the prosecutor's statements during closing arguments constituted fundamental error.

We affirm.

# Facts and Procedural History

[2] On December 21, 2016, twenty-year-old Bradley Davis asked his uncle, Gridley, to purchase alcohol for him. In return, Gridley requested Davis assist him in purchasing other items. Davis picked up Gridley at Gridley's mother's house, and they drove to Kroger, where Gridley directed Davis to purchase lighter fluid and a cold pack. Then they went to a CVS pharmacy. Gridley went in alone and purchased a box of pseudoephedrine. Gridley asked Davis to

---

[1] Ind. Code § 35-48-4-1.1 (2016).

[2] Ind. Code § 35-43-4-2(a)(1) (2014).

go in and purchase more; however, the pharmacist told Davis they were sold out. When told this news, Gridley became "agitated." (Tr. Vol. II at 120.)

[3] Davis and Gridley proceeded to a liquor store, where Gridley went inside and bought a bottle of liquor for Davis. Gridley "said something about wanting to get high" to Davis. (*Id*. at 123.) On their way back to Gridley's mother's house, the men stopped at a Gillman's Home Center.[3] Because Davis was out of cash and did not want to give Gridley the debit card he used,[4] both men went inside to make their purchases. After getting directions to the correct location in the store from a cashier, the men went to the aisle where pipe cutters were located. Gridley found one he liked but Davis did not see it again after Gridley picked it up. The men then picked out lighter fluid and drain cleaner. Gridley pointed to the type he wanted and Davis picked them up. Davis purchased the lighter fluid and drain cleaner.

[4] Kyle Hitham, the general manager at Gillman's Home Center, was notified a staff member had found empty packaging for a pipe cutting tool. Hitham reviewed his surveillance tapes and cash register system to narrow down when the tool may have been taken and who was in the store at that time. Hitham found surveillance showing Davis and Gridley in the store in the area where the

---

[3] Gillman's Home Center has a "lumber yard, hardware store . . . everything . . . you would need for home repair[.]" (Tr. Vol. II at 71-72.)

[4] Davis and his significant other shared a debit card that was in the significant other's name.

pipe cutting tool was located. He confirmed their presence, via video surveillance, when they purchased the lighter fluid and drain cleaner.

[5] Indiana State Trooper Howard "Chip" Ayers had educated Hitham in the ingredients needed to make methamphetamine. Hitham recognized the pipe cutting tool can be used to strip the lithium out of batteries and the lighter fluid and drain cleaner are used in the chemical process used to make methamphetamine. Based on that knowledge, once he had identified the men he suspected of theft, Hitham contacted Trooper Ayers.

[6] Trooper Ayers, trained specifically in methamphetamine-related crimes, reviewed the surveillance footage provided by Hitham, together with the cash register sales data, and contacted Davis' significant other in an attempt to locate Davis. Once Trooper Ayers contacted Davis, Davis volunteered to "come to the Indiana State Police Post located on the south portion of Versailles to speak with" Trooper Ayers. (*Id*. at 190.) Davis told Trooper Ayers everything that happened that day, including the purchases at Kroger and CVS. Davis' account of the events cemented Trooper Ayers' suspicions that Gridley was attempting to manufacture methamphetamine.

[7] On March 3, 2017, the State charged Gridley with Level 4 felony conspiracy to manufacture methamphetamine,[5] Level 4 felony attempt to manufacture

---

[5] Ind. Code § 35-48-4-1.1 (2016).

methamphetamine, Level 6 felony possession of precursors,[6] and Class A misdemeanor theft.[7] On March 12, 2018, the State moved to dismiss the conspiracy and possession charges. The case proceeded to trial on three charges: attempt to manufacture methamphetamine as a Level 4 felony, theft as a Class A misdemeanor, and theft enhanced to a Level 6 felony based on prior convictions. The first two of these charges were presented to the jury.

[8]  While Gridley was in jail awaiting trial, he made a phone call to his mother wherein he stated, "Bradley Fuckin' [sic] told on me. Bradley told everything. And you know the only me and Brad, [sic]" (Tr. Vol. II at 170.) The phone call was a "free call[,]" (*id.*), and was cut short because the jail "do[es]n't give them a multitude of minutes on a [sic] free calls." (*Id.*)

[9]  During Trooper Ayers' testimony at trial, the trial court noted one of the jurors did not "seem to be with it." (*Id.* at 206.) The State agreed the juror should be replaced with an alternate. The trial court stated: "For the record, it looks to me like he was falling asleep, then he also creates a lot of noises in his slumber, other jurors turned and looked at him and then looked at me like, what the heck." (*Id.* at 207.) Gridley objected to dismissing the juror "without giving him a warning or giving him a chance to explain his behavior." (*Id.* at 207-08.) The trial court called the juror to the bench and asked him about falling asleep.

[6] Ind. Code § 35-48-4-14.5 (2014).

[7] Ind. Code § 35-43-4-2(a) (2014).

The juror apologized and agreed he had been asleep. The trial court dismissed the juror and replaced him with an alternate. Gridley did not object to the dismissal or request a jury admonishment. Nevertheless, when the jury reconvened, the trial court addressed the jury:

> Ladies, and Gentleman, make sure your paying attention. Uh, I think I don't have to explain as to way the other gentleman is no longer with us cause, numerous jurors were, I saw concern on your faces. Um, and quickly realized myself that the gentleman had and was falling in and out of consciousness, so he had to be excused. But, please, this is an important matter, we need your undivided attention as best as you could do.

(*Id*. at 211) (errors in original).

[10] On cross-examination, defense counsel asked Trooper Ayers, "What efforts did you make to try to talk to Mr. Gridley?" (*Id*. at 226.) Trooper Ayers responded, "Well, Mr. Gridley had been arrested on another offense through a separate county." (*Id*.) Counsel requested to approach the bench and indicated Trooper Ayers' answer exceeded the scope of the order *in limine*.[8] The State argued Gridley elicited this information because of the way he presented the question on cross-examination. The trial court directed Gridley to "change

---

[8] Earlier in the proceedings, the trial court granted Gridley's motion *in limine*. We cannot read the first page of the motion because either the original record or the e-filed record is too distorted. The parties appear to agree the motion requested evidence of Gridley's prior conduct, statements, and criminal history not be admitted. As the parties appear to agree as to the scope of the motion, we proceed based on the parties' representations.

your line of questioning." (*Id.* at 228.) Gridley did not object, request an admonishment, or request a mistrial.

[11] During closing arguments, the State relied, in part, on the premise that methamphetamine manufacturing was harming the community as a whole. The State requested the jury rely on its common sense and life experience. The State delineated the evidence it had presented, *i.e.* the surveillance footage, Davis' testimony about Gridley's statements that day, Trooper Ayers' testimony about the ingredients needed to make methamphetamine, the records from CVS that show Gridley purchased pseudoephedrine, the records from Gillman's showing the purchase of lighter fluid and drain cleaner, and the phone records from the jail. The State noted methamphetamine is "the same stuff th[at] poisons our community every single day[,]" (*id.* at 233), how "we've decided as a community, as a society, as a State, under our Law, that the manufacture of methamphetamine will not stand[,]" (*id.* at 234), that methamphetamine cooks in southern Indiana prefer the particular lighter fluid purchased by Gridley and Davis, and that methamphetamine manufacturing is "a community problem." (*Id.* at 240.) The State then requested the jury "just hold the Defendant accountable." (*Id.*) Gridley did not object to these statements.

[12] The jury found Gridley guilty of attempt to manufacture methamphetamine and misdemeanor theft. Gridley then pled guilty to the facts allowing his theft conviction to be enhanced to Level 6 felony. The trial court sentenced Gridley to an aggregate sentence of eleven years.

# Discussion and Decision

## Juror Replacement

[13] Gridley argues the trial court abused its discretion by removing a sleeping juror.[9]

> Article I, § 13, of the Indiana Constitution guarantees a defendant's right to an impartial jury; therefore, a biased juror must be dismissed. Ind. Trial Rule 47(B) provides in part, "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have broad discretion in determining whether to replace a juror with an alternate, and we will only reverse such determinations where we find them to be arbitrary, capricious or an abuse of discretion.

*May v. State*, 716 N.E.2d 419, 421 (Ind. 1999) (internal citations omitted). As the trial court is in the best position to assess the juror and the juror's ability to perform his or her duties, "our review of the trial court's decisions in these matters is highly deferential." *Id.*

---

[9] Because the removal occurred late in the presentation of evidence, Gridley attempts to analogize the removal to one that occurs during jury deliberations. If juror removal occurs during deliberations, removal is still "ultimately a matter requiring deference to the trial court's judgment, but it raises a number of considerations not present before deliberations begin." *Riggs v. State*, 809 N.E.2d 322, 327 (Ind. 2004). However, the removal of Gridley's juror did not occur during deliberations; it occurred part way through the State's last witness. We decline Gridley's invitation to extend those extra considerations to removal of a juror prior to deliberations. *See, e.g., Campbell v. State*, 500 N.E.2d 174, 181 (Ind. 1986) (deciding issue without reference to extra considerations when removal happened during presentation of evidence).

[14] Here, the trial court noticed a juror was sleeping and making noises while sleeping that were disturbing other jurors. The trial court advised both Gridley's counsel and the State of the situation. The State agreed the juror had been sleeping. Gridley's counsel objected to the juror's removal if the trial court was not going to give the juror a chance to explain. The trial court asked the juror to approach and asked him about sleeping. The juror admitted he had been sleeping and apologized. The trial court dismissed the juror and replaced him with an alternate. Gridley did not object to the dismissal and did not request the jury be admonished. When the trial reconvened, the trial court explained to the jury that the juror was no longer with them and advised them all to "make sure your [sic] paying attention." (Tr. Vol. II at 211.) He acknowledged that he had seen the concern on their faces as the dismissed juror "was falling in and out of consciousness[.]" (*Id*.)

[15] While the "mere falling asleep for a short time, by a juror, . . . does not of itself constitute a sufficient cause for a new trial[,]" *McClary v. State*, 75 Ind. 260, 262, (1881), the trial court did not abuse its discretion by replacing the sleeping juror with an alternate. The trial court questioned the juror, confirmed the juror had been sleeping, and explained to the remaining jurors the reason for the dismissal. In this case, the alternate juror was present and, presumably, awake up to the point of this juror's dismissal and the jury had not begun deliberations. The trial court's explanation of the juror's dismissal negated any possible effect the dismissal may have had on the jury deliberations later in the process. *See Casey v. State*, 689 N.E.2d 465, 467 (Ind. Ct. App. 1997) (trial court's dismissal

of the lone African-American juror after that juror "stated that his 'system was all messed up'" was not an abuse of discretion because the trial court had "admonished the jury not to speculate as to the cause of the juror's excusal").

## Order in Limine

[16] Gridley argues that Trooper Ayers testified in violation of the order *in limine* regarding references to prior bad acts. "Sanctions for violation of the trial court's pretrial order are for the trial court to assess." *Ritchie v. State*, 809 N.E.2d 258, 269 (Ind. 2004), *reh'g denied, cert. denied* 546 U.S. 828 (2005). Therefore, the issue on appeal is "whether the misconduct requires a retrial, not whether it violates a trial court order." *Id*. As such, the trial court's decision to grant a mistrial or to take a lesser step "is afforded great deference on appeal because the trial court is in the best position to gauge the surrounding circumstances of the event and its impact on the jury." *Schlomer v. State*, 580 N.E.2d 950, 955 (Ind. 1991).

[17] Here, on cross-examination of Trooper Ayers, the following occurred:

> [Defense Counsel]: When did you first get the opportunity to have a conversation with Mr. Gridley about this case?
>
> [Trooper Ayers]: I never had that opportunity. I attempted to, but I never had that opportunity.
>
> [Defense Counsel]: What efforts did you make to try to talk to Mr. Gridley?

[Trooper Ayers]: Well, Mr. Gridley had been arrested on another offense through a separate county.

(Tr. Vol. II at 226.)

[18] At that point, defense counsel requested to approach the bench and argued he had not asked Trooper Ayers where Gridley was found. The State noted the question was asked by the defense, that it was "not something that the state brought out on Direct[,]" (*id.* at 227), and Trooper Ayers was only saying "literally what happened and was the response to all the defense questions." (*Id.*) The trial court advised defense counsel to "change your line of questioning." (*Id.* at 228.) Defense counsel did not further object, request an admonishment, or request a mistrial.

[19] Gridley acknowledges he did not request an admonishment about the testimony and did not request a mistrial. Thus, this issue is waived. *See Orta v. State*, 940 N.E.2d 370, 377 (Ind. Ct. App. 2011) (issue waived if not presented before trial court), *trans. denied*. Gridley argues, however, the violation was fundamental error. Fundamental error is extremely narrow and available only when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and when the violation is so prejudicial to the rights of the defendant as to make a fair trial impossible. *Jewell v. State*, 887 N.E.2d 939, 942 (Ind. 2008). Gridley does not meet that standard.

[20] Gridley argues this violation constitutes fundamental error because "Trooper Ayers [was] an experience[d] officer and witness, kn[ew] he was not to make any comment on Gridley's arrest, [and] answered defense counsel's question with information he knew was prejudicial to Gridley." (Br. of Appellant at 16.) Gridley argues, whether intentional or not, the violation "merits a new trial." (*Id.*)

[21] Although admission of evidence of prior bad acts is generally error, *see* Ind. Evidence Rule 404(b), when the reference is "fragmentary at best[,]" *Schlomer*, 580 N.E.2d at 955, the admission is harmless. *Id*. at 956. Not only did the testimony consist of a single sentence that Gridley had been arrested in another county, the statement did not disclose the reason for the arrest, whether charges had been filed pursuant to that arrest, or whether the arrest resulted in a conviction. Additionally, the statement was elicited by defense counsel, not the State. Moreover, the State presented substantial independent evidence of Gridley's guilt. Given the strength of that evidence, any probable persuasive effect of Trooper Ayers' single-sentence response that Gridley had been arrested in another county would have been minimal. *See Moore v. State*, 551 N.E.2d 459, 461 (Ind. Ct. App. 1990) (when admission was inadvertent, fragmentary, and not deliberately elicited by the State, and the evidence against the defendant is strong, the trial court does not err in denying a mistrial).

# Closing Statements

[22] Gridley argues the prosecutor committed misconduct during the State's closing statement. He contends the State's comments "were an invitation for the jury to convict [Gridley] in order to combat the methamphetamine epidemic in Southeastern Indiana rather than because Gridley was guilty of a crime." (Br. of Appellant at 18.)

[23] In reviewing a claim of prosecutorial misconduct, we determine whether misconduct occurred and, if so, whether the misconduct placed the defendant in a position of grave peril to which he or she would not have otherwise been subjected. *Jerden v. State,* 37 N.E.3d 494, 498 (Ind. Ct. App. 2015). The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* To preserve a claim of prosecutorial misconduct, the defendant must request the jury be admonished at the time the alleged misconduct occurs, and if further relief is needed, move for a mistrial. *Id.* Failure to do so results in waiver. *Id.*

[24] Gridley did not object to the alleged misconduct, did not ask for the jury to be admonished, and did not request a mistrial. Thus, this argument is waived. Where a prosecutorial misconduct claim has been waived for failure to preserve, the defendant must establish not only the grounds for misconduct but also that the misconduct resulted in fundamental error, an extremely narrow exception. *Id.*

[25] The State's appeal to a community standard notwithstanding, the State did not argue the jury should ignore the evidence; rather, the State outlined the evidence it had presented to demonstrate Gridley was guilty of the charges. That evidence showed Gridley purchased pseudoephedrine; had gone with Davis to Gillman's; had purchased, through Davis, two items needed to manufacture methamphetamine; had told Davis that he wanted to "get high[,]" (Tr. Vol. II at 123); and made incriminating statements while talking to his mother on the phone while incarcerated.

[26] In addition, the jury instructions informed the jury the State had the burden of proof, Gridley was innocent until proven guilty, and statements made by counsel were not evidence. (*See* App. Vol. II at 153 (Final Instruction No. 7 on the presumption of innocence); *id*. at 154 (Final Instruction No. 8 on the burden of proof); *id*. at 155 (Final Instruction No. 9 on what evidence to consider); *id*. at 157 (Final Instruction No. 11 on using "[n]either sympathy nor prejudice for or against either the victim or the defendant [to] influence [findings]"); *id*. at 162 (Final Instruction No. 16 that [s]tatements made by attorneys are not evidence).)

[27] In light of the substantial evidence of Gridley's guilt and the instructions provided by the court, Gridley has not demonstrated fundamental error that would warrant a new trial. *See Emerson v. State*, 952 N.E.2d 832, 838 (Ind. Ct. App. 2011) (any misconduct in prosecutor's statement cured by court's general instruction), *trans. denied*.

# Conclusion

[28]     As the trial court did not abuse its discretion in replacing a sleeping juror during the presentation of evidence and Gridley has not demonstrated fundamental error, we affirm.

[29]     Affirmed.


Baker, J., and Tavitas, J., concur.