

**FILED**

Dec 04 2019, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvette M. LaPlante
LaPlante LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jon L. Norton, Jr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 4, 2019<br><br>Court of Appeals Case No.<br>19A-CR-872<br><br>Appeal from the Vanderburgh<br>Superior Court<br><br>The Honorable Robert J. Pigman,<br>Judge<br><br>Trial Court Cause No.<br>82D03-1611-F4-6794 |

**Najam, Judge.**

## Statement of the Case

[1] Jon L. Norton, Jr. appeals his convictions and sentence for one count of sexual misconduct with a minor, as a Level 4 felony, and three counts of sexual

misconduct with a minor, as Level 5 felonies, following a jury trial. Norton presents seven issues for our review, which we revise and restate as follows:

1. Whether the trial court committed fundamental error when it did not sever his trial.

2. Whether the trial court committed fundamental error when it allowed one of the victims to testify about an alleged offense that had occurred in Kentucky.

3. Whether the trial court abused its discretion when it did not allow one of the victims' sisters to testify about specific instances in which the victim had been dishonest.

4. Whether the trial court abused its discretion when it did not allow Norton to review mental health records for one of the victims.

5. Whether the trial court erred when it failed to remove a juror.

6. Whether the State presented sufficient evidence to support his conviction for one count of sexual misconduct with a minor, as a Level 5 felony.

7. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

[2] We affirm.

## Facts and Procedural History

[3]   In mid-2016, fourteen-year-old A.J. was living with her mother, L.D.[1] During that summer, Norton, who was thirty-two years old, was dating M.K., one of A.J.'s sisters. When Norton first began to spend time with M.K. and her family, he "wrestled around" and "played" with A.J. and the other children "a lot." Tr. Vol. III at 18. At first, A.J. thought that "it was normal because he did it with everybody else." *Id.* However, at some point, the interaction between A.J. and Norton "changed." *Id.*

[4]   In mid-November, A.J. got in trouble at school, which caused her to get in trouble at home. A.J. "got mad," and she ran away from L.D.'s house. *Id.* at 166. L.D. and some other family members began to look for A.J., and they called the police. While they were looking for A.J., L.D. learned that A.J. "was having relationships" with Norton. *Id.* at 167. Police officers eventually found A.J. and returned her to L.D.

[5]   The next day, L.D. asked A.J. about Norton. At first, A.J. was not "fully forthcoming." *Id.* at 168. But A.J. ultimately informed L.D. that she and Norton had a "sexual relationship" and that she had performed oral sex on him "one time." *Id.* at 174. Based on A.J.'s statements, L.D. organized a family meeting. At the family meeting, A.J. told the family that her relationship with Norton had been "an ongoing thing." *Id.* at 175. A.J. ultimately told her

---

[1] L.D. is A.J.'s biological sister who adopted A.J.

family that Norton had engaged in sexual intercourse with her on one occasion, that she had performed oral sex on Norton "two or three times," and that Norton had placed her hand on his penis on three occasions. *Id*. at 32

[6]   During that same summer, Norton and M.K. would spend "a lot" of time with another one of A.J.'s sisters, M.C., and M.C.'s fourteen-year-old stepdaughter, A.G. *Id*. at 116. They were "constantly doing family stuff together." *Id*. Norton was "like an uncle" to A.G. *Id*. at 117. He would "always wrestle" with the kids and "just goof around." *Id*. at 118. But Norton's behavior toward A.G. changed, and he paid more "physical attention" to her. *Id*. A.G. felt as though the roughhousing was "directed toward [her] and not so much with the other kids." *Id*.

[7]   On October 31, A.G. and the rest of the family were outside of Norton's house preparing to go trick or treating. A.G. went into Norton's house to look for bags for the kids, and Norton followed her. While A.G. was walking back toward the door to the house, Norton "nudg[ed]" her from her back, and he "pushed" her "down on the couch." *Id*. at 119, 120. He then put his forehead against A.G.'s forehead, and he put his hands between her thighs and rubbed her "private part." *Id*. at 121. At that point, M.K. walked in, and Norton "jumped backwards." *Id*. at 119. The family proceeded to go trick or treating. Later that night, everyone went to M.C.'s house for pizza. At one point, A.G. went to the kitchen to get drinks for all of the kids. Norton followed A.G. into the kitchen, and he started "smacking [her] butt." *Id*. at 121. A.G. first thought Norton was "trying to be goofy," but then he started "roughhousing" with her,

which made her "uncomfortable." *Id.* at 121, 122. A.G. ultimately informed her family that Norton "had tried to do things with her." *Id.* at 188.

[8] As a result of A.J.'s and A.G.'s allegations to the family, the family called the police. The family also contacted the Indiana Department of Child Services and arranged to have A.J. and A.G. interviewed by a forensic interviewer. Shortly after the events with Norton had occurred, A.G. stayed for a brief period of time at Deaconess Cross Pointe ("Deaconess"), which is a mental health facility.

[9] On November 22, the State charged Norton with eight counts of sexual misconduct with a minor, as Level 4 felonies (Counts 1 through 8), and four counts of sexual misconduct with a minor, as Level 5 felonies (Counts 9-12).[2] The trial court scheduled a jury trial for February 11 through February 14, 2019. On February 6, five days before the start of the trial, Norton issued a subpoena to Deaconess for A.G.'s mental health records. At a hearing on February 8, Deaconess moved to quash the subpoena based on its belief that it could not issue A.G.'s medical records because Norton had not complied with two statutory requirements. The court took the matter under advisement.

[10] During Norton's jury trial, the State presented A.J.'s testimony as evidence. A.J. testified that she had performed oral sex on Norton on multiple occasions.

---

[2] Count 1 alleged that Norton had engaged in sexual intercourse with A.J. Counts 2 through 8 alleged that Norton had submitted to other sexual conduct with A.J. Counts 9 and 10 alleged that Norton had fondled A.J. And Counts 11 and 12 alleged that Norton had fondled A.G.

The State asked A.J. about the first time that she had performed oral sex on Norton, and A.J. stated that it had happened at Norton's brother's house in Kentucky. The State then informed A.J. that "[w]e need to stick mostly to what you remember happening here in Evansville[.]" *Id*. at 28.

[11] After the State had concluded its direct examination of A.J., Juror Number Six advised the court that he recognized A.J. Specifically, Juror Number Six stated that A.J. was a "friend of his daughter's" and that he would "sometimes" pick A.J. and his daughter up from skating. *Id*. at 41. He then told the court that he had not seen A.J. "in two years." *Id*. at 42. At that point, the court asked Juror Number Six if his recognition of A.J. "would impact [his] ability to be an impartial juror." *Id*. In response, Juror Number Six said: "No." *Id*. The court also asked if Juror Number Six felt "any different about [his] ability to be impartial now that [he's] seen her," and Juror Number Six replied: "No, no." *Id*. at 43. Norton moved to strike that juror, but the court denied his motion.

[12] Norton then cross-examined A.J. and questioned her about the events that had allegedly occurred in Kentucky. Norton stated that A.J. could talk about those allegations "because it helps us get a big picture." *Id*. at 74. Norton proceeded to question A.J. about the number of offenses that had allegedly occurred in Kentucky. When A.J. responded that there were "three or four" instances, Norton asked her to describe those events. *Id*. at 84.

[13] The State also presented the testimony of L.D. as evidence. During his cross-examination of L.D., Norton questioned her about A.J.'s reputation.

Specifically, Norton asked L.D. if A.J. had a reputation for being dishonest. L.D. responded that she and A.J. have "had personal issues." *Id.* at 176. Norton also asked L.D. if A.J. had a reputation at school for being dishonest. L.D. replied that she did not know. Norton then asked if A.J. had a reputation in their family for being dishonest. L.D. responded: "Like I said[,] we had personal issues." *Id.* at 177. At that point, Norton attempted to question L.D. about specific instances in which A.J. was dishonest. The State objected, and the trial court sustained that objection.

[14] Prior to the start of the third day of trial, the court held a hearing on Deaconess' motion to quash Norton's subpoena for A.G.'s mental health records. At that hearing, A.G.'s father objected to the release of A.G.'s mental health records to Norton. A.G.'s father stated that A.G.'s stay at Deaconess was due to a "teenager thing" that had "nothing to do" with the allegations against Norton. *Id.* at 200. Deaconess and A.G.'s father then waived the statutory requirement for a written petition for release of records and the requirement for a fifteen-day notice of the hearing on the written petition. However, A.G.'s father reiterated his objection to the release of the records to Norton but agreed to allow the trial court to review them *in camera* to determine if they were relevant. The court reviewed those records and ultimately determined that they were "not related to this event." Appellant's App. Vol. II at 45. Accordingly, the court did not allow Norton to review A.G.'s mental health records.

[15] At the conclusion of the State's case-in-chief, Norton moved for a directed verdict on Counts 4 through 8. The trial court granted Norton's motion in part

and entered a directed verdict on Counts 7 and 8, but the court denied Norton's motion as to Counts 4 through 6. Norton then proceeded to present evidence. After Norton had called two witnesses, Juror Number Six informed the court that he recognized an individual observing the trial.[3] Juror Number Six told the court that the observer, Brittney, was his stepbrother's daughter. He then informed the court that he had only seen Brittney "five times in her life." Tr. Vol. IV at 151. The court proceeded to ask Juror Number Six if there was anything about knowing Brittney that would "make it difficult" for him to perform his duties. *Id*. at 150. Juror Number Six responded: "No." *Id*. The court then asked if Juror Number Six felt like he "can live up to [his] oath and make an impartial decision based on the evidence and the law." *Id*. at 151. The juror responded affirmatively. Norton did not move to strike Juror Number Six at that time.

[16] At the conclusion of the trial, the jury found Norton guilty of Count 2, sexual misconduct with a minor, as a Level 4 felony, and Counts 10, 11, and 12, sexual misconduct with a minor, as Level 5 felonies. The jury found Norton not guilty of Counts 1, 3 through 6, and 9. The trial court entered judgment of conviction accordingly. Following a hearing, the court sentenced Norton to eleven years on Count 2 and to four years each for Counts 10 through 12. The

---

[3] The State contends that "there is nothing in the record" to support the conclusion that the juror who recognized a spectator was the same juror who knew A.J. Appellee's Br. at 17, n.3. But Norton included in his supplemental appendix affidavits from the Bailiff and the Court Reporter in which both individuals affirmed that "the juror involved in both instances was Juror Number 6[.]" Supp. App. Vol. II at 5.

court then ordered the sentence for Count 2 to run concurrent with Count 10 but consecutive to the sentences for Counts 11 and 12, for an aggregate sentence of fifteen years in the Department of Correction. This appeal ensued.

# Discussion and Decision

## *Issue One: Severance of Trial*

[17] Norton first contends that the trial court committed fundamental error when it did not *sua sponte* sever the charges against him based on A.J.'s allegations from his charges based on A.G.'s allegations. As our Supreme Court has explained:

> The fundamental error exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. This exception is available only in egregious circumstances.

*Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quotation marks and citations omitted). To prove fundamental error, the appellant must show "that the trial court should have raised the issue *sua sponte* . . . ." *Taylor v. State*, 86 N.E.3d 157, 162 (Ind. 2017).

[18] Norton acknowledges that he did not file a motion to sever his charges. However, he maintains that the trial court was required to *sua sponte* sever the charges against him because the potential prejudice to him that resulted from the joinder of the offenses was so great that it made a fair trial impossible. To

support his assertion that the trial court was obligated to *sua sponte* sever his charges, Norton relies on Indiana Code Section 35-34-1-11(a) (2019), which provides in relevant part:

> Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, *the defendant shall have a right to a severance of the offenses*. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense[.]

(Emphasis added). Based on the language of that statute, Norton contends that he was not required to file a motion for severance but, rather, that he had an absolute right to a severance of the charges against him, which right did not require his motion to exercise.

[19] Our Supreme Court addressed a similar issue in *Muse v. State*, 419 N.E.2d 1302, 1305 (Ind. 1981). In *Muse*, the defendant did not file a motion to have the charges against him severed. On appeal, he asserted that the trial court had committed fundamental error when it did not sever his charges despite his failure to file a motion because "the potential prejudice to defendants from the joinder of unrelated offenses is so great that they should not even be put in a position of having to request a separation." *Id.* The Indiana Supreme Court disagreed and stated that a defendant "has an automatic right to have the counts be tried separately *if* he makes a timely motion for severance." *Id.* (emphasis added). The Court further stated that, while the trial court "has no

discretion" to deny a motion for severance if the offenses had been joined solely because they are of the same or similar character, the "burden is on the defendant to make a timely motion for severance." *Id.* Accordingly, the Court held that a trial court does not commit fundamental error when it does not *sua sponte* sever charges against a defendant. *Id.*

[20] Similarly, here, Norton failed to file a motion to sever the charges against him. But he contends that the court was required to *sua sponte* sever the charges because the potential for harm is "substantial" and because he had a statutory right to have the charges severed since the offenses were joined solely on the ground that they were of the same or similar character. Appellant's Br. at 35 (emphasis removed). However, as in *Muse*, Norton only had an automatic right to have the charges against him severed if he had made a timely motion. The burden was on him to make the motion, not on the trial court to take action *sua sponte*. *Muse*, 419 N.E.2d at 1305. Accordingly, the trial court did not commit fundamental error when it did not *sua sponte* sever the charges against him.

### Issue Two: Testimony Regarding Kentucky Allegations

[21] Norton next asserts that the trial court committed fundamental error when it allowed A.J. to testify about an instance in which Norton allegedly had her perform oral sex on him while in Kentucky, which testimony Norton contends violated Indiana Evidence Rule 404(b). Norton acknowledges that he did not object to that testimony. But Norton contends that the "trial court certainly should have[,] at a minimum, provided an admonishment *sua sponte* once the testimony had been placed before the jury." Appellant's Br. at 27.

However, "[o]ur case law has long required the parties to request an admonishment from the court—not to have the court act *sua sponte*—if the parties think such an admonishment might be appropriate." *Merritt v. State*, 99 N.E.3d 706, 710 (Ind. Ct. App. 2018), *trans. denied*. The reason for putting that burden on the parties and not on the trial court is obvious: "admonishments are double-edged swords. On the one hand, they can help focus the jury on the proper considerations for admitted evidence. On the other hand, they can draw unnecessary attention to unfavorable aspects of the evidence." *Id*. (citation omitted). "The risk calculus inherent in a request for an admonishment is an assessment that is nearly always best made by the parties and their attorneys and not *sua sponte* by our trial courts." *Id*. Accordingly, Norton's argument on this issue must fail.

### Issue Three: L.D.'s Testimony Regarding A.J.'s Reputation

Norton also contends that the trial court abused its discretion when it precluded him from questioning L.D. about specific instances in which A.J. was untruthful. As the Indiana Supreme Court has stated:

> Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. *Tynes v. State*, 650 N.E.2d 685, 687 (Ind. 1995). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its ruling on admissibility for abuse of discretion" and we only reverse "if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)).

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015). But a trial court's interpretation of a rule of evidence or a statute presents an issue of law that we review *de novo*. *Tyler v. State*, 903 N.E.2d 463, 467 n.4 (Ind. 2009).

[24] On appeal, Norton contends that the trial court abused its discretion when it did not allow him to question L.D. about times when A.J. had lied because he maintains that that testimony was admissible pursuant to Indiana Evidence Rule 608(b). That rule provides:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of another witness whose character the witness being cross-examined has testified about.

Ind. Evidence Rule 608(b).

[25] Here, when Norton attempted to ask L.D. about specific occasions in which A.J. had been dishonest, the State objected, and the trial court sustained that objection. At that point, Norton made an offer of proof and asserted that L.D. would testify that A.J. had "made accusations" that L.D. had been involved in "physical altercation[s]" with A.J., which accusations L.D. would testify were "false." Tr. Vol. III at 180. On appeal, Norton maintains that that testimony was admissible because those "specific instances of dishonesty" would rebut L.D.'s "failure to provide a candid answer about [A.J.'s] reputation for

dishonesty" with "reliable evidence of A.J.'s untruthfulness that also supports the defense's theory that A.J. had a motive to make false allegations." Appellant's Br. at 29.

[26] However, we need not decide whether the trial court erred when it precluded L.D. from testifying about specific instances of A.J.'s dishonesty because any error in the exclusion of that evidence was harmless. As our Supreme Court has recently stated:

> An error excluding evidence is harmless if "its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Rohr v. State*, 866 N.E.2d 242, 246 (Ind. 2007) (quoting *Williams v. State*, 714 N.E.2d 644, 652 (Ind. 1999)); *see also* App. R. 66(A); Ind. Trial Rule 61. When making this determination, we consider the evidence's likely impact on a reasonable, average jury. *See Bonner v. State*, 650 N.E.2d 1139, 1141-42 (Ind. 1995).

*Tunstall v. Manning*, 124 N.E.3d 1193, 1200 (Ind. 2019).

[27] Here, while the trial court excluded L.D.'s testimony about specific instances in which A.J. was dishonest, Norton questioned multiple witnesses about A.J.'s reputation for dishonesty. Indeed, Norton asked L.D. if A.J. "has a reputation for being dishonest." Tr. Vol. III at 176. In response, L.D. stated that she and A.J. have "had personal issues." *Id.* Norton then asked L.D. if A.J. has a reputation at school for being dishonest. L.D. responded: "I don't know. Not that I'm aware of." *Id.* at 177. And Norton again asked L.D. if A.J. has a

reputation in her family for being dishonest. L.D. replied: "Like I said, we had personal issues." *Id.*

[28] In addition to questioning L.D., Norton also questioned M.K. about A.J.'s reputation. Specifically, Norton asked M.K. if A.J. has "a reputation for dishonesty" in the community. Tr. Vol. IV at 38. M.K. responded in the affirmative. Norton also asked M.K. if A.J.'s reputation for dishonesty was "present among the family," to which M.K. responded: "Yes." *Id.* Norton then asked M.K. if A.J.'s reputation for dishonesty is one that she "holds in the neighborhood." *Id.* M.K. again responded affirmatively. And Norton asked M.K. if that reputation for lying is one that A.J. holds at church. M.K. stated that it was. Further, Norton questioned another witness, Denise Wolf, about A.J.'s reputation. Wolf testified that A.J. has a reputation in the community for being dishonest and that she believed A.J. to be dishonest.

[29] In essence, while Norton was unable to question L.D. about specific instances in which A.J. was dishonest, Norton was still able to elicit testimony from three different witnesses, one of whom is A.J.'s mother and one of whom is A.J.'s sister, that A.J. has a reputation for lying. Further, during his closing arguments, Norton repeatedly stated that A.J. has a reputation for lying. Accordingly, Norton was still able to place evidence of A.J.'s reputation for dishonesty before the jury. As such, any error in the exclusion of L.D.'s testimony regarding specific instances of dishonesty is sufficiently minor in light of all of the other evidence of her reputation for dishonesty such that it did not

affect Norton's substantial rights.  *See Tunstall*, 124 N.E.3d at 1200.  Norton has not demonstrated that the trial court committed reversible error on this issue.

### Issue Four:  A.G.'s Mental Health Records

[30]     Norton next asserts that the trial court abused its discretion when it did not allow him to review A.G.'s mental health records from Deaconess.  This Court previously provided that

> [o]ur standard of review in discovery matters is abuse of discretion.  Thus, we will reverse only where the trial court has reached an erroneous conclusion which is clearly against the logic and effect of the facts of the case. . . .  Moreover, due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal.  We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court.

*Williams v. State*, 819 N.E.2d 381, 384-85 (Ind. Ct. App. 2004).  Pursuant to statute, "[a] patient's mental health record is confidential and shall be disclosed only with the consent of the patient unless otherwise provided[.]"  Ind. Code. § 16-39-2-3.  Further, "[e]xcept as provided in section 8 of this chapter, the mental health record is not discoverable or admissible in any legal proceeding without the consent of the patient."  I.C. § 16-39-2-7.

[31]     Here, there is no dispute that A.G.'s father did not give consent for Norton to review A.G.'s mental health records.  Accordingly, Norton had to seek release of the records pursuant to Indiana Code Section 16-39-2-8, which provides that the court "may order the release of the patient's mental health record without

the patient's consent upon the showing of good cause following a hearing under IC 16-39-3[.]" That chapter of the Indiana Code allows the trial court to release mental health records if the court finds by a preponderance of the evidence that: "(1) other reasonable methods of obtaining the information are not available or would not be effective; and (2) the need for disclosure outweighs the potential harm to the patient." I.C. § 16-39-3-7.[4]

[32] In support of his request for access to A.G.'s records, Norton asserted to the trial court that he should be allowed to review those records because they were material to his defense. In essence, Norton alleged that the need for disclosure of A.G.'s mental health records outweighed the potential harm to A.G. However, Norton made no showing to the trial court, and makes no contention on appeal, that "other reasonable methods of obtaining the information [we]re not available or would not be effective." I.C. § 16-39-3-7(1). Indeed, Norton does not allege that he was denied an opportunity to question A.G., either before or during trial, about whether she had discussed the alleged molestation with her mental health provider.

[33] After the court denied Norton access to A.G.'s mental health records, Norton could have recalled A.G. as a witness and asked her, while she was under oath,

---

[4] Generally, a person seeking access to a patient's mental health records without the patient's consent must file a petition with the trial court, I.C. § 16-39-3-3, and provide notice of a hearing to be conducted at least fifteen days prior to the hearing to the patient's guardian if the patient is a minor, as is the case here, and to the provider that maintains the records. I.C. § 16-39-3-4. There is no dispute that Norton did not comply with either of those statutory requirements. However, at the hearing on Deaconess' motion to quash Norton's subpoena, both Deaconess and A.G.'s father waived those two requirements.

if she had received inpatient treatment from Deaconess approximately one month after she had made the allegations against Norton and if she had disclosed to her service providers that she had been the victim of intimate crime. That is the same information he asserts he would have learned from her mental health records. Because Norton could have obtained the same information from A.G. that he could have obtained from a review of her mental health records, the trial court properly declined to release the records to him.[5] *See* I.C. § 16-39-3-7 (providing that a court may release mental health records if the court finds that other reasonable methods of obtaining the information are not available).[6]

### Issue Five: Failure to Remove Juror

[34] Norton next contends that the trial court erred when it failed to remove Juror Number Six during the trial. It is well settled that the "right to a fair trial before an impartial jury is a cornerstone of our criminal justice system." *Whiting v. State*, 969 N.E.2d 24, 28 (Ind. 2012). As this Court has recently stated:

> Article 1, § 13, of the Indiana Constitution guarantees a defendant's right to an impartial jury; therefore, a biased juror must be dismissed. . . . Trial courts have broad discretion in

---

[5] To the extent Norton contends that the trial court erred when it failed to make a "particularized finding" under Indiana Code 16-39-3-7, Norton has not directed us to any authority to support his position. Reply Br. at 14. Rather, the plain language of that statute allows a court to either release mental health records or not. That statute does not contain any requirement for the court to issue a finding that explains its reasoning.

[6] We note that the trial court denied Norton access to the records based on its conclusion that they were "not related to this event." Appellant's App. Vol. II at 45. However, we may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court. *Williams*, 819 N.E.2d at 384-85.

determining whether to replace a juror with an alternate, and we will only reverse such determinations where we find them to be arbitrary, capricious or an abuse of discretion. As the trial court is in the best position to assess the juror and the juror's ability to perform his or her duties, our review of the trial court's decisions in these matters is highly deferential.

*Gridley v. State*, 121 N.E.3d 1071, 1076 (Ind. Ct. App. 2019) (cleaned up). Further, as the trial court is in the best position to assess the juror and the juror's ability to perform his or her duties, "'our review of the trial court's decision in these matters is highly deferential.'" *Id.* (quoting *May v. State*, 716 N.E.2d 419, 421 (Ind. 1999)).

[35]  We first address Norton's contention that the trial court abused its discretion when it denied his motion to strike Juror Number Six even though that juror knew A.J.[7] Norton maintains that the trial court abused its discretion because the juror could not remain unbiased given his familiarity with one of the victims. However, the trial court was in the best position to assess the honesty and integrity of Juror Number Six and his ability to perform as an impartial juror despite his prior encounters with A.J. When the juror informed the court that he knew one of the victims, the court questioned him about his ability to remain impartial. In response, Juror Number Six twice unequivocally stated

---

[7] In his brief on appeal, Norton makes one argument that the trial court abused its discretion when it did not strike Juror Number Six based on that juror's knowledge of both A.J. and Brittney. However, we will separately address whether the court abused its discretion when it denied Norton's motion to strike the juror based on his knowledge of A.J. and whether the court erred when it did not remove that juror based on his knowledge of both individuals.

that he could remain impartial. Accordingly, we cannot say that the trial court abused its discretion when it denied Norton's motion to strike Juror Number Six based on his knowledge of A.J.

[36] Norton also contends that the trial court erred when it failed to remove Juror Number Six after he had informed the trial court that Brittney, a spectator, was his stepbrother's daughter.[8] Specifically, Norton contends that the trial court should have removed that juror after he recognized a second individual involved with the trial because it would be "impossible" for that juror to be so closely related to multiple individuals without having an "unconscious bias" toward them, which bias was a "threat" to his right to an impartial jury. Appellant's Br. at 24. In essence, Norton maintains that the trial court should have removed Juror Number Six based on the cumulative effect of his knowledge of A.J. and Brittney.

[37] But Norton did not move to strike that juror after the juror had informed the court of his familial relationship with Brittney. Because Norton did not raise this issue to the trial court, he has not preserved it for our review. And Norton

---

[8] Brittney is also Norton's ex-wife and the mother of one of Norton's children. That child was a witness for the defense at trial.

does not argue fundamental error in his principal brief on appeal.[9]  Accordingly,
Norton has waived this argument, and we do not consider it.

### Issue Six:  Sufficiency of the Evidence

[38]     Norton next alleges that the State failed to present sufficient evidence to support
one of his convictions for sexual misconduct with a minor, as a Level 5 felony,
which relates to an allegation involving A.G.[10]  Norton contends that the State
failed to present sufficient evidence to support his conviction based on the
instance in which Norton was "smacking [A.G.'s] butt."  Tr. Vol. III at 121.
Our standard of review on a claim of insufficient evidence is well settled:

> For a sufficiency of the evidence claim, we look only at the
> probative evidence and reasonable inferences supporting the
> verdict.  *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007).  We do
> not assess the credibility of witnesses or reweigh the evidence.
> *Id*.  We will affirm the conviction unless no reasonable fact-finder
> could find the elements of the crime proven beyond a reasonable
> doubt.  *Id*.

*Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017).

[39]     To prove that Norton committed sexual misconduct with a minor, as a Level 5
felony, the State was required to show that Norton was at least twenty-one

---

[9] Norton instead raised fundamental error for the first time in his reply brief, which is prohibited.  *See Curtis v. State*, 948 N.E.2d 1143, 1149 (Ind. 2011).

[10] Norton does not challenge the sufficiency of the evidence to support his conviction based on this instance in which he rubbed A.G.'s vagina.  Neither does he challenge the sufficiency of the evidence to support either of his convictions that relate to A.J.

years old and that he fondled A.G., who was at least fourteen years of age but less than sixteen years of age, with the intent to arouse or to satisfy the sexual desires of either Norton or A.G. I.C. § 35-42-4-9(b)(1) (2016). On appeal, Norton contends that the State presented insufficient evidence "to prove that there was any inappropriate touching or intent by Norton to arouse his sexual desires or the sexual desires of A.G." Appellant's Br. at 21. Specifically, Norton contends that the State failed to present sufficient evidence because A.G. initially interpreted Norton's actions as "goofy" and because A.G. did not indicate that "Norton was aroused or doing things that one would expect an individual trying to become aroused would do." *Id*. at 22.

[40] It is well settled that the "element of intent of child molesting may be established by circumstantial evidence and inferred from the actor's conduct and the natural and usual sequence to which such conduct usually points." *Wise v. State*, 763 N.E.2d 472, 475 (Ind. Ct. App. 2002). Further, it is reasonable for the jury to infer that the intent existed even without a direct showing of that intent. *See Altes v. State*, 822 N.E.2d 1116, 1121 (Ind. Ct. App. 2005).

[41] Here, the evidence most favorable to the verdict shows that, after the family had returned from trick or treating, Norton followed A.G. into the kitchen and started "smacking [her] butt." Tr. Vol. III at 121. And the evidence demonstrates that that event occurred on the "same night" that Norton had pushed A.G. onto the couch and rubbed her vagina, which Norton does not dispute he did with the intent to arouse either his or A.G.'s sexual desires. *Id*.

[42] As discussed above, we will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Love*, 73 N.E.3d at 696. Here, given the fact that Norton had smacked A.G.'s butt only a short while after he had engaged in other inappropriate behavior with her with the intent to arouse either his or A.G.'s sexual desires, a reasonable jury could infer that he had also "smack[ed her] butt" with the intent to arouse sexual desires. *Id.* Because a reasonable jury could find the elements of the crime proven beyond a reasonable doubt, we conclude that the State presented sufficient evidence to support Norton's conviction for sexual misconduct with a minor, as a Level 5 felony. *See, e.g.*, *Meehan v. State*, 7 N.E.3d 255, 258-59 (Ind. 2014).

### Issue Seven: Appropriateness of Sentence

[43] Finally, Norton contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This court has recently held that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has recently explained that:

> The principal role of appellate review should be to attempt to
> leaven the outliers . . . but not achieve a perceived "correct"

result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind.), as amended (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

*Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (omission in original).

[44] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[45] The sentencing range for a Level 4 felony is two years to twelve years, with an advisory sentence of six years. I.C. § 35-50-2-5.5 (2019). And the sentencing range for a Level 5 felony is one year to six years, with an advisory sentence of three years. I.C. § 35-50-2-6(b). Here, the trial court identified as aggravating factors Norton's criminal history, the fact that Norton was under court

supervision when he committed the instant offenses, the fact that Norton has had multiple petitions to revoke his probation filed in previous cases, and that he had committed another offense while out on bond for the instant offense. And the court did not identify any mitigating factors. Accordingly, the court sentenced Norton to eleven years on the Level 4 felony conviction and to four years on each of the Level 5 felony convictions. The court then ordered one of the four-year sentences to run consecutive to the eleven-year sentence, for an aggregate sentence of fifteen years.

[46] On appeal, Norton contends that his sentence is inappropriate in light of the nature of the offenses because the "evidence does not show that these particular crimes were any more egregious than other crimes of this type." Appellant's Br. at 37. And Norton contends that his sentence is inappropriate in light of his character because he "is a good father to two young children" and because "he had become sober." *Id.*

[47] However, Norton has not met his burden on appeal to demonstrate that his sentence is inappropriate. With respect to the nature of the offenses, Norton twice engaged in sexual misconduct with two victims, A.J. and A.G., both of whom were related to Norton's girlfriend. And A.G. considered Norton to be part of her family. As a result of the offenses against A.J., A.J. was "bullied" by members of Norton's family who attended the same school as A.J., and she had to attend counseling. Tr. Vol. IV at 209. Norton has not presented compelling evidence portraying the nature of the offenses in a positive light. *See Stephenson*, 29 N.E.2d at 122.

[48] As to his character, Norton has a lengthy criminal history that includes three prior felony convictions and eighteen prior misdemeanor convictions. Further, Norton was under court supervision when he committed the instant offense. Moreover, Norton has been given numerous opportunities to avoid incarceration in the past through alternative sentences, but he continues to commit crimes. We cannot say that Norton's sentence is inappropriate in light of his character. We affirm Norton's sentence.

## Conclusion

[49] In sum, we hold that: the trial court did not commit fundamental error when it did not *sua sponte* sever Norton's trial or when it did not *sua sponte* admonish the jury regarding A.J.'s testimony of an event that had allegedly occurred in Kentucky; the trial court did not abuse its discretion when it did not allow Norton to question L.D. about specific instances in which A.J. was untruthful; the trial court did not abuse its discretion when it did not allow Norton to view A.G.'s mental health records; the trial court did not err when it did not remove Juror Number Six; the State presented sufficient evidence to support Norton's conviction for sexual misconduct with a minor, as a Level 5 felony; and Norton's sentence is not inappropriate in light of the nature of the offenses or his character. We therefore affirm Norton's convictions and sentence.

[50] Affirmed.

Vaidik, C.J., and Tavitas, J., concur.