## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 03 2020, 7:09 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Justin Cherry,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 3, 2020

Court of Appeals Case No.
19A-CR-2273

Appeal from the Putnam Circuit Court

The Honorable Matthew L. Headley, Judge

Trial Court Cause No.
67C01-1706-F1-156

**Altice, Judge.**

# Case Summary

Justin Cherry appeals the fifty-five-year aggregate sentence that was imposed following his convictions for Level 1 felony burglary, Level 2 felony conspiracy to commit burglary, and two counts of Level 3 felony armed robbery, claiming that it was "an overly harsh jury trial penalty." *Appellant's Brief* at 12. Cherry also argues that his sentence was inappropriate when considering the nature of the offense and his character.

We affirm.

# Facts and Procedural History

The facts, as reported in Cherry's first direct appeal to this court, are as follows:

> Around 4 a.m. on April 2, 2017, Terry McCarter heard a loud noise toward the front of his house. Terry and his wife, Patsy McCarter, were in bed at the time. Upon hearing the noise, Terry went to investigate. Terry was confronted in his dining room by a masked man with a gun. The man ordered Terry to lay face down on the floor.
>
> Three more men came into the house, and one of them held Terry at gunpoint. Another man went to the bedroom, pointed a gun at Patsy, and said "we're going to rob you." (Tr. Vol. II at 176). The man stuffed all of Patsy's jewelry into a pillowcase. He then took the jewelry and a safe he found out of the room, before returning and ransacking the room. The man ordered Patsy out of bed and flipped the mattress. The man found a gun on the nightstand and took it. Because the man was covered from head to toe in black clothing, Patsy was not able to describe any characteristics of the robber, but she noticed he was wearing unique gloves with white patterns. While Patsy was being held

in the bedroom, and Terry was being held in the dining room, the other two men searched the rest of the house and stole everything of value. Terry heard one of the men refer to another as "Dustin or Justin or something like that." (Id. at 159).

From the house, the men stole $500 from Terry's wallet, $6,000 from the McCarters' small business that was stored in a desk, $200 from Patsy's purse, a .223 rifle, an antique musket loader, a .22 rifle, a single shot shotgun, a leaded-glass clock, multiple prescription medications, Patsy's jewelry, the safe, and the handgun from the bedroom. From the McCarters' barn, the men took a chainsaw, a tool set, and some smaller personal items. From the garage, the men took an air compressor and some drills.

After about an hour, when the men had finished plundering the McCarters' property, the men ordered Terry and Patsy into a sunroom adjoining their bedroom. The men demanded to know where their "stash" was. (Tr. Vol. II at 143.) Then, one of the men hit Terry in the back of the head with the butt of a rifle, knocking Terry unconscious. The men locked Terry and Patsy in the sunroom.

When Terry awoke, he and Patsy watched the four men walk to their garage and steal their 2003 Buick Rendezvous. After the men left, Terry escaped the sunroom through an unlocked, second entrance. He went to the garage, found his cell phone, and drove the couple's other car to a location with sufficient cell service to call police. Officers responded and began their investigation. On a ramp leading up to the garage, police found a shoe print not belonging to Terry or Patsy.

Terry was evaluated by paramedics but opted not to go to the hospital. The back of Terry's head turned black and blue. Three days after the robbery, Terry began to have severe headaches that

continued to worsen. A nearby hospital diagnosed him with hemorrhaging near the brain. Terry was transferred to St. Vincent Hospital in Indianapolis, where the doctors determined the bleeding had stopped. Terry was told he had a large amount of blood on the brain and would continue to have headaches. After going home, Terry's condition worsened. He returned to St. Vincent Hospital where the doctors discovered the bleeding had begun again. Terry underwent surgery and spent five days in the hospital recovering.

A few days after the burglary, in Indianapolis, Christina Blair noticed a suspicious vehicle parked along the street outside her home. The driver appeared to be waiting until nobody was watching before he exited the car. Blair watched as the man exited the car and went to a house at 3855 Spann Avenue, which recently had been the site of police activity. Blair walked up to the car and noticed it had a handicapped license plate, despite the man not appearing to be handicapped. Blair reported the vehicle to the police.

The officer responding to Blair's call ran the car's plates. He discovered it was the vehicle stolen from the McCarters. The officer surveilled the vehicle for a while, and eventually had it impounded. The vehicle was transported to the Putnam County Sheriff's Department, where it was searched. Police found a receipt from a McDonald's restaurant on Southeastern Avenue in Indianapolis, and the receipt had a timestamp after the robbery. Deputy McFadden of the Putnam County Sheriff's Department traveled to Indianapolis and drove past the home at 3855 Spann Avenue to gather information. Deputy McFadden drove behind the home and noticed the garage partially open. A man, later identified as Justin Cherry, came out of the garage and watched Deputy McFadden drive by.

On April 9, 2017, officers with the Indianapolis Metropolitan Police Department ("IMPD") executed a search warrant at 3855

Spann Avenue. In the garage, the police discovered pill bottles with the names of Terry and Patsy McCarter on them. Officers also seized a phone belonging to Daltyn Randolph, one of the occupants.

Deputy McFadden also obtained his own warrant to search 3855 Spann Avenue. IMPD officers secured the residence and ordered everyone out. After a delay, Daltyn Randolph, Steven Cosand, Michael Hostetler, and Ronnie Sosby exited. Thirty minutes after those four exited, Cherry surrendered. Cherry's boots were removed and compared to the print found at the McCarter's home. In one of the bedrooms, deputies found multiple pieces of mail addressed to Cherry, along with pictures of Cherry and his daughter, and a safe containing pieces of jewelry belonging to Patsy. In an airduct in the same bedroom, police recovered the .38 handgun taken from the McCarter's nightstand. Police also recovered a cell phone belonging to Cosand while searching the house.

On May 10, 2017, IMPD officers executed a search warrant on a storage unit rented by a girlfriend of Paul Reese, who was another suspect being investigated by police. The storage unit contained multiple items belonging to the McCarters. Police obtained search warrants for both of the phones they found at 3855 Spann Avenue. A search of Randolph's phone revealed three contacts: Justin, Paul, and Drake. There was also a web search for "Couple held at gunpoint for an hour during home invasion." (Tr. Vol. III at 38). A search of Cosand's phone revealed the same three contacts. The contact information for "Justin" matched a number Cherry had previously provided to a "state government official." (Tr. Vol. III at 134).

Using the information obtained, police secured a search warrant for cell phone records connected to Cherry's phone number. The information showed Cherry travelled west on Interstate 70 on April 1, around 8:30 p.m. By 9:20 p.m., Cherry's phone pinged

on towers near Greencastle, Indiana, until 10:00 p.m. The information also showed Cherry was in communication with Charles Maybaum by way of multiple text messages and phone calls on April 1.

Cherry was arrested and charged with Level 2 felony burglary, Level 2 felony conspiracy to commit burglary, Level 1 felony burglary with serious injury, Level 3 felony conspiracy to commit armed robbery, Level 3 felony criminal confinement, Level 6 felony theft, Level 6 felony auto theft, and two counts of Level 3 felony armed robbery. A jury found Cherry guilty of all nine counts. The trial court sentenced Cherry on all nine counts to an aggregate sentence of seventy-three years in prison.

*Cherry v. State*, No. 18A-CR-2120, *slip op.* at 2-7 (Ind. Ct. App. June 21, 2019).

[4] On direct appeal, we determined that Cherry's convictions for Level 2 felony burglary, Level 3 felony conspiracy to commit armed robbery, Level 3 felony criminal confinement, Level 6 felony theft, and Level 6 felony auto theft violated double jeopardy prohibitions. Thus, we remanded for re-sentencing on the four remaining convictions.

[5] At the subsequent sentencing hearing on August 22, 2019, Cherry presented evidence that two of his codefendants had pleaded guilty. Maybaum's plea agreement capped his sentence at thirty years for Level 2 felony burglary and two counts of Level 3 felony armed robbery. The trial court ordered the sentence to run concurrently with an anticipated sentence in a separate cause in Owen County. Randolph pleaded guilty to Level 2 felony burglary and was sentenced twenty years, with ten years suspended.

[6] During cross-examination, Cherry acknowledged that Reese, a third co-defendant, was found guilty by a jury of conspiracy to commit burglary as a Level 2 felony, confinement while armed with a deadly weapon, a Level 3 felony, theft, a Level 6 felony, auto theft, a Level 6 felony, two counts of armed robbery, each as a Level 3 felony, and burglary, a Level 1 felony. Reese was sentenced to an executed aggregate term of seventy-two years.

[7] Cherry denied that he was present or participated in the burglary of the McCarters' home, admitted that he had more convictions than did Randolph, and acknowledged that the Level 1 felony conviction was a higher-level offense than what Maybaum was charged with in Owen County.

[8] The trial court rejected Cherry's argument that his sentence should match the sentences of Randolph or Maybaum and observed that

> I do also recognize though, however, that your Counsel has put out that they're comparing sentences. However, I think you were the first or second one to go out of the four. So yes, you have every right to exercise your constitutional right to have a case proven beyond a reasonable doubt in each of these things, and you did that, no question about it.
>
> But at the same time, when the evidence came out, you know, that's—that's what happens. You might want to be able to compare sentences, but at the same time, nobody was getting anywhere it sounded like from your own statement, whether you had to rat out, or whatever you used the word was, to testify against other people within the group. But that was your choice. You chose that choice. Mr. Bookwalter and the State of Indiana did not have to give any plea agreement whatsoever. There's no

requirement that I'm understanding that you have to have a plea agreement in any kind of criminal case.

So, you know, this is one of the bad cases of Putnam County and of the State of Indiana. You know, you've got to be punished for this.

*Supplemental Transcript Vol. II* at 17-18.

[9] The trial court then identified the following aggravating circumstances: (1) Cherry's "significant criminal record"; (2) the harm that resulted from Cherry's crimes was greater than the elements necessary to prove his offenses; and (3) the age of his victims, both of whom were over sixty-five and "physically infirm." *Id.* at 17. As for mitigators, the court found that Cherry had minor children and "had a tenth-grade education." *Id.* Concluding that the aggravating circumstances outweighed the mitigators, the trial court sentenced Cherry to forty years on one count of Level 1 felony burglary with serious bodily injury, twenty years for Level 2 felony conspiracy to commit burglary, and fifteen years on each Level 3 felony armed robbery count. Cherry was ordered to serve the forty-year sentence for burglary consecutively to one fifteen-year sentence for armed robbery. The remaining two counts were ordered to run concurrently to the fifty-five-year aggregate executed sentence. Cherry now appeals.

## I. Jury Trial Penalty

[10] Cherry argues that the trial court abused its discretion in sentencing him to fifty-five-years because that term of imprisonment improperly penalized him for exercising his right to a jury trial. Cherry claims that there was a "gross

disparity" between his and the codefendants' sentences for the same offenses and thus contends that his sentence was disproportionate to the nature of the charged offenses. *Appellant's Brief* at 11.

[11]  Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007). An abuse of discretion occurs if a trial court's sentence is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *K.S. v. State,* 849 N.E.2d 538, 544 (Ind. 2006). A trial court may be found to have abused its discretion when it: (1) fails to enter a sentencing statement at all; (2) enters a sentencing statement that explains the reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons; (3) enters a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration; or (4) gives reasons for the sentence that are improper as a matter of law. *Anglemyer,* 868 N.E.2d at 490-91.

[12]  Cherry claims that his sentence was improper because it exceeded Maybaum's sentence by twenty-five years and Randolph's by forty-five years. Cherry cites to the proposition that a sentence may not be imposed that "conflicts with a defendant's exercise of his constitutional right to a jury trial," in support of his claim. *Appellant's Reply Brief* at 5 (citing *Walker v. State,* 454 N.E.2d 425, 429 (Ind. Ct. App. 1983)). Thus, Cherry contends that his sentence violated Article

1 section 16 of the Indiana Constitution, which provides that "[a]ll penalties shall be proportioned to the nature of the offense," for the purpose of sentencing in criminal cases. While we may consider Article 1, Section 16 challenges concerning the application of the sentencing statutes, we will not "set aside a legislatively sanctioned penalty merely because it seems too severe." *Conner v. State*, 626 N.E.2d 803, 806 (Ind. 1993). Reversal may be warranted only when the penalty is not "graduated and proportioned to the nature of the offense." *Shoun v. State*, 67 N.E.3d 635, 641 (Ind. 2017).

[13] In this case, Cherry was convicted of Level 1 felony burglary, Level 2 felony conspiracy to commit burglary, and two counts of Level 3 felony armed robbery. The statutory sentencing range for a Level 1 felony is between twenty and forty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4(b). The sentencing range for a Level 2 felony is between ten and thirty years, and the range for a Level 3 felony is between three and sixteen years. I.C. § 35-50-2-4.5; I.C. § 35-50-2-5(b).

[14] In essence, Cherry is requesting that we adopt a form of comparative proportionality review, which the Indiana Constitution does not require. *Baird v. State*, 604 N.E.2d 1170, 1183 (Ind. 1992). The "proportionality" mentioned in Article 1 section 16 addresses whether the sentence a defendant receives is appropriate to the nature of the particular offense and offender, "not whether the sentence is reasonable in light of all other cases imposing a similar sentence." *Stevens v. State*, 691 N.E.2d 412, 438 (Ind. 1997). In other words, Article 1, Section 16 review requires that Cherry's sentence be proportional to

the facts of *his* offenses, not to those of his co-defendants. That said, the sentences that Maybaum and Randolph received as a result of their guilty pleas have no bearing on the constitutionality of Cherry's sentence.

[15] The evidence in this case established that during the early morning hours of April 2, 2017, Cherry and his three co-defendants forcibly entered the McCarter's home, ransacked the residence and robbed the couple of their possessions and thousands of dollars in cash while holding them at gunpoint. Cherry and his codefendants threatened to kill the McCarters and Terry McCarter was struck in the head, leaving him unconscious and seriously injured.

[16] In sum, the record establishes that the fifty-five-year sentence is proportionate to the nature and gravity of the particularly violent and calculated nature of the offenses that Cherry committed. Hence, Cherry's claim that the term of imprisonment improperly penalized him for exercising his right to a jury trial fails.

## II. Inappropriate Sentence

[17] Cherry next argues that his sentence was inappropriate when considering the nature of the offense and his character and maintains that he must be resentenced. In accordance with Indiana Appellate Rule 7(B), we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "The principal role of a

Rule 7(B) review 'should be to attempt to leaven the outliers . . . but not to achieve a perceived "correct" result in each case.'" *Dilts v. State,* 80 N.E.3d 182, 188 (Ind. Ct. App. 2017) (quoting *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind. 2008)), *trans. denied*.

[18]     We independently examine the nature of Cherry's offense and his character under App. R. 7(B) with substantial deference to the trial court's sentence. *Satterfield v, State*, 33 N.E.3d 344, 355 (Ind. 2015). "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State,* 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied.* Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Dilts,* 80 N.E.3d at 188-89. Cherry bears the burden of persuading us that his aggregate fifty-five-year sentence is inappropriate in light of the nature of the offense and his character. *Id.* at 188.

[19]     As for the nature of the offense, Cherry once again argues that his sentence should be revised because it was not the same as what his co-defendants received. The argument does not consider the fact that co-defendant Reese received a sentence that exceeded his by seventeen years. Also, while we may compare sentences of co-defendants when considering the appropriateness of a sentence, we are under no obligation to do so. *Knight v. State*, 930 N.E.2d 20, 22 (Ind. 2010).

[20] The record demonstrates that the nature of Cherry's crime spree was particularly egregious and calculated. Terry and Patsy McCarter were both over sixty-five when Cherry and the others broke and entered their house, robbed them at gun point, and stole their car and other possessions. Sometime after Terry was struck in the head with the rifle butt, he underwent emergency surgery to relieve the pain and brain hemorrhaging. One of the men placed a gun to Patsy's head and threatened to "blow her brains out" unless Terry told them where their "stash" was located. *Transcript Vol. II* at 142-43. At the time, Patsy had recently broken her ankle and had recently undergone two surgeries to repair the injuries. Aside from the significant physical and psychological injuries that the McCarters suffered as a result of Cherry's and his co-defendants' actions, they sustained a substantial loss of personal property including family heirlooms, firearms, antiques, and furniture, which were either stolen or destroyed during the burglary. In short, there is no evidence that would warrant a sentence reduction when considering the nature of the offense.

[21] As for Cherry's character, the record shows that Cherry expressed no remorse for his crimes. Moreover, notwithstanding the evidence at trial and the subsequent finding of guilt, Cherry claimed that he was not even present when the offenses were committed. The trial court noted that Cherry had amassed a lengthy criminal history. Even a minor criminal history reflects poorly on a defendant's character for the purposes of sentencing. *Rutherford v. State,* 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). The significance of a defendant's criminal history varies based on the gravity, nature, and number of prior

offenses in relation to the current offense. *Johnson v. State,* 986 N.E.2d 852, 857 (Ind. Ct. App. 2017). Cherry was first adjudicated a criminal delinquent in 2004, and his first misdemeanor conviction was in 2007. Cherry has accumulated seven prior felony convictions that include burglary, theft, and auto theft. Cherry also had three pending felony charges when he was sentenced in this case.

[22]  In sum, Cherry's lengthy criminal history, his propensity to commit additional offenses, and his refusal to acknowledge his involvement in the burglary or to show remorse for the harm inflicted upon the victims, does not warrant a reduction of his sentence.

[23]  Judgment affirmed.

Bradford, C.J. and Robb, J., concur.